**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

KELLY DAVID ANKENY, SR.,
            *Defendant-Appellant.*

No. 05-30457

D.C. No.
CR-04-00005-
MWM

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued July 27, 2006;
Resubmitted June 5, 2007
Portland, Oregon

Filed June 19, 2007
Amended September 5, 2007

Before: Stephen Reinhardt, A. Wallace Tashima, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Graber;
Dissent by Judge Reinhardt

11463

## COUNSEL

Stephen R. Sady, Chief Deputy Federal Public Defender, Portland, Oregon, for the defendant-appellant.

Richard A. Friedman, Appellate Section, Criminal Division, United States Department of Justice, Washington, D.C., for the plaintiff-appellee.

**ORDER**

The government's request for clarification is GRANTED. The opinion filed on June 19, 2007, is amended as follows:

On slip opinion page 7239 (490 F.3d 744, 756), replace the last sentence of footnote 7 with:

> We need not decide whether the amendment applies retroactively, though, because the government— despite later assertions to the contrary—never argued in briefing or oral argument that the amendment should apply retroactively. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

Judges Tashima and Graber have voted to deny the petition for panel rehearing, and Judge Reinhardt has voted to grant it. Judge Graber has voted to deny the petition for rehearing en banc, and Judge Tashima has so recommended. Judge Reinhardt has voted to grant the petition for rehearing en banc.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on it.

The petition for panel rehearing and petition for rehearing en banc are DENIED.

No further petitions for rehearing or rehearing en banc may be filed.

---

**OPINION**

GRABER, Circuit Judge:

Defendant Kelly David Ankeny, Sr., was indicted on four counts of being a felon in possession of a firearm and one

count of possession of an unregistered sawed-off shotgun. The district court denied his motion to suppress and, reserving the right to appeal that decision, Defendant pleaded guilty. The district court sentenced him to 262 months' imprisonment pursuant to the Armed Career Criminal Act of 1984 ("ACCA") and the Career Offender provision of the United States Sentencing Guidelines ("U.S.S.G.").

On appeal, Defendant argues that: (1) the evidence seized during the search of his residence should have been suppressed; (2) the district court should have dismissed all but one count of felon in possession; (3) the government should have been required to allege Defendant's prior convictions in the indictment and prove them to a jury beyond a reasonable doubt; (4) his prior convictions do not qualify as predicate felonies under ACCA; and (5) the district court erred in applying the Career Offender guideline.

We hold that the motion to suppress was properly denied, but that the convictions were multiplicitous and that material errors were made at sentencing. Thus, we affirm the convictions but vacate the sentence and remand for resentencing.

## FACTUAL AND PROCEDURAL HISTORY

On October 21, 2003, Michele Rayley reported to the Portland police that Defendant, with whom she has an 18-year-old son, had choked and kicked her. The altercation with Defendant took place when Rayley went to the house where their son was living, located at 936 N.E. 94th Avenue in Portland, and found that Defendant was living there. She confronted Defendant about her belief that he was supplying drugs to their son, at which point Defendant became angry and attacked her. He then ran to another floor of the house and returned waving a semi-automatic handgun. Rayley told police that she believed Defendant was using methamphetamines and that he might flee or shoot at police.

The case was referred to Officer Rhodes of the Domestic Violence Reduction Unit. In ongoing conversations, Rayley reported to Rhodes that several other people, including an infant and a prison associate of Defendant, also were living in the house. Rayley told Rhodes that, on October 31, 2003, she and Defendant had another argument during which he displayed a handgun.

Officer Rhodes conducted a background check on Defendant and found that he had several outstanding arrest warrants and an extensive criminal history, including convictions for possession and delivery or manufacture of controlled substances, attempting to elude a police officer, escape, felon in possession of a firearm, and robbery. He also had been charged with, but not convicted of, assault on a police officer and aggravated assault.

The police considered various options for how to proceed, including arresting Defendant during a traffic stop, and ultimately decided that it was necessary to arrest Defendant at the house. The police believed that a street arrest would pose a risk to public safety because Defendant had a lengthy record of violence and hostility toward the police. Further, the police believed that an arrest outside the house would be risky because there was evidence of drug and firearm activity inside the house, in addition to the presence of a prison associate of Defendant.

A warrant was authorized on November 18, 2003, and executed on November 20, 2003, at around 5:30 a.m. The house was dark, and there was no noise or movement from within. The Special Emergency Reaction Team ("SERT") led the operation. Thirteen officers were assigned to enter the home and, in total, 44 officers participated in the execution of the warrant.

Officer Stradley yelled "police, search warrant" while pounding on the door and, about one second later, officers

used a battering ram to break open the door. Officer Wilcox entered and directed a light-mounted weapon into the house. Defendant had been sleeping on a recliner near the front door; he stood up as the officers broke down the door. Officer Wilcox instructed Defendant to show his hands and get down. Officer Forsyth then threw a flash-bang device into the center of the room. Officer Forsyth testified at the suppression hearing that he heard Officer Wilcox tell Defendant to show his hands; he did not recall hearing him tell Defendant to get down. The flash-bang device had a fuse delay of one to one-and-a-half seconds. Officer Forsyth stated that Defendant went down to the floor during that delay, and the device exploded near his upper body. Because of his proximity to the flash-bang device when it exploded, Defendant suffered first- and second-degree burns to his face and chest and second-degree burns to his upper arms.

Meanwhile, officers stationed outside the house shot out the second-story windows with rubber bullets. Officers securing the second level of the house threw a second flash-bang device into an open area. A man and a woman were lying in bed in that area, and the explosion caused the bed to catch fire. After attempting to extinguish the fire, officers threw the mattress and box spring out of a window.

Extensive damage was done to the house during the entry. The police shot out approximately ten windows, kicked in many doors, burned carpet, and made holes in the walls and ceilings with the rubber bullets.[1]

Thereafter, the police recovered a 9mm semiautomatic handgun from the crack between the arm and the bottom cushion of the chair in which Defendant was sitting when the

---

[1]The owner of the house estimated that the damage cost him $14,000 to repair. He filed a claim against the City of Portland for the loss, received $10,000, and decided, after consulting a lawyer, not to pursue a civil suit for the remainder.

police entered the house. They also recovered a semiautomatic handgun on an adjacent chair. The police found a 12-gauge sawed-off shotgun and a .22-caliber long rifle in a closet in an upstairs bedroom and another .22-caliber rifle in the basement of the house. The police seized approximately $3,000, ammunition, and suspected drugs and drug paraphernalia.

Defendant was indicted on four counts of being a felon in possession of a firearm and one count of possession of an unregistered sawed-off shotgun. Soon thereafter, the government filed notice of its intent to seek a sentence enhancement under the ACCA and identified three predicate felonies. Defendant moved to suppress the evidence seized during the search. After an evidentiary hearing, briefing, and argument, the district court denied the motion. Defendant entered a conditional guilty plea, reserving the right to appeal the denial of his motion to suppress.

The Presentence Investigation Report ("PSR") specified a base offense level of 37, which included application of the Career Offender guideline. After a three-level downward adjustment for acceptance of responsibility, Defendant's total offense level was 34 with a criminal history category of VI, resulting in an advisory Sentencing Guidelines range of 262 to 327 months.

Defendant filed a motion to dismiss as multiplicitous all but one count of his being a felon in possession of a firearm. He also filed objections to the application of the ACCA and the Career Offender guideline. He argued both that his prior convictions were not predicate felonies under ACCA and that prior convictions must be alleged in the indictment and proved to a jury in order to comport with the Sixth Amendment. The district court rejected all of Defendant's arguments. The court considered various sentencing factors and acknowledged that the Guidelines were advisory, but declined to go below the Guideline range because of the seriousness of the

offense and Defendant's extensive criminal record. The court sentenced Defendant to 262 months' imprisonment for each count of being a felon in possession of a firearm and 120 months' imprisonment for the count of possession of an unregistered sawed-off shotgun, with the sentences to run concurrently. Defendant timely appealed.

## DISCUSSION

### A.   *Motion to Suppress*

We first address Defendant's contention that the evidence found in the house should have been suppressed because the police failed to knock and announce their presence, a failure not justified by exigency, and because the extent of force used by the police rendered the search unreasonable.

In a published opinion, the district court found that the amount of time between the knock and the entry was "so brief in time to be virtually the equivalent to a no-knock entry," but held that there were exigent circumstances justifying the police action. *United States v. Ankeny*, 358 F. Supp. 2d 998, 1000-01 (D. Or. 2005). The district court declined to decide whether the overall manner of execution of the warrant was unreasonable because the "inevitable discovery" doctrine applied:[2] the police had a warrant, and "[a]ny excess force used does not change" the fact that they would have discovered the evidence in the house. *Id.* Thus, the court held that, "for general objections to the manner of executing a search,

---

[2]In this circuit, the "inevitable discovery" doctrine, first recognized in *Nix v. Williams*, 467 U.S. 431 (1984), provides that if, "by following routine procedures, the police would inevitably have uncovered the evidence," then the evidence will not be suppressed despite a constitutional violation. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1399 (9th Cir. 1989). That concept is closely related to the "independent source" doctrine, which provides that evidence discovered by independent legal means should not be suppressed even though there was an illegal search as well. *Id.* at 1396.

suppression requires a causal link between those complained-of behaviors and the seizure of the evidence," and there was no such causal link here. *Id.* at 1002.

On de novo review, *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc), we agree with the district court: even if the knock-and-announce violation and the other aspects of the search amounted to Fourth Amendment violations, suppression is not warranted.

## 1.  *Knock and Announce*

Turning first to the alleged knock-and-announce violation, *see Wilson v. Arkansas*, 514 U.S. 927, 930 (1995) ("[The] common-law knock and announce principle forms a part of the reasonableness inquiry under the Fourth Amendment."), we hold that suppression is foreclosed by the Supreme Court's decision in *Hudson v. Michigan*, 126 S. Ct. 2159 (2006).

**[1]** In *Hudson*, police entered a suspect's home, with a warrant, after announcing their presence and waiting three to five seconds. The state conceded that there was a knock-and-announce violation. The Court held that violation of the knock-and-announce rule did not merit suppression of evidence found in the search, because the purposes of the knock-and-announce rule—to protect bodily safety, property, and privacy—are not vindicated by excluding evidence obtained after the rule has been violated. *Id.* at 2165. The Court emphasized that the knock-and-announce rule does not protect "one's interest in preventing the government from seeing or taking evidence described in a warrant" and that the social costs of exclusion for knock-and-announce violations outweigh the benefits of deterrence. *Id.* at 2165-66. Thus, we need not resolve whether the knock-and-announce rule was violated and, if so, whether the violation was justified by exigent circumstances. Under *Hudson*, the evidence should not be suppressed in any event.

**[2]** Defendant asserted at oral argument that this case is not governed by *Hudson*, because the police could have obtained a no-knock warrant but failed to do so.**[3]** According to Defendant, that failure rendered the entry "essentially warrantless." We disagree. There is no requirement that the police obtain a no-knock warrant simply because one is available. *See Richards v. Wisconsin*, 520 U.S. 385, 396 n.7 (1997) (commenting that the fact that a no-knock entry has not been authorized in advance "should not be interpreted to remove the officers' authority to exercise independent judgment concerning the wisdom of a no-knock entry at the time the warrant is being executed"). Further, we decline to limit *Hudson* so narrowly to its facts. The Supreme Court made it clear that, because the knock-and-announce rule protects interests that "have nothing to do with the seizure of . . . evidence, the exclusionary rule is inapplicable" to knock-and-announce violations. *Hudson*, 126 S. Ct. at 2165.

2.   *Manner of Entry*

Defendant contends that, beyond the alleged knock-and-announce violation, the police's manner of entry violated the Fourth Amendment. He urges us to hold that the overall violence and destructiveness of the officers' actions were unreasonable and, thus, that suppression is warranted.

---

**[3]**Defendant also asserted at oral argument that this case is different from *Hudson* because the federal knock-and-announce statute, 18 U.S.C. § 3109, applies. That issue was waived. Defendant did not argue, either before the district court or in his opening brief to this court, that § 3109 applies. *See United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) (holding that issues not raised in a party's opening brief are waived); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) (noting general rule that we will not consider arguments for the first time on appeal). Accordingly, we need not decide whether the *statute* independently might require suppression. Moreover, we note that the search was not conducted by federal officers. *See United States v. Combs*, 394 F.3d 739, 742 n.1 (9th Cir. 2005) (stating that § 3109 does not govern the conduct of state officers).

**[3]** It is true that "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness." *Dalia v. United States*, 441 U.S. 238, 258 (1979). Unnecessary destruction of property or use of excessive force can render a search unreasonable. *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004); *Liston v. County of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997). Deciding whether officers' actions were reasonable requires us to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted).

**[4]** Whether this entry and search were conducted reasonably is a close question. The police had legitimate concerns about their safety in entering and searching the house. Defendant had a substantial criminal record, which included violent crimes; there was reliable evidence that he was armed and aggressive; there were several other people in the house, including a former prison inmate; and certain physical characteristics of the house made it difficult to secure.[4] Officers testified at the suppression hearing that the element of surprise was very important due to those factors and that they used the battering ram, rubber bullets, and flash-bang devices in order to surprise and distract the occupants of the house. Thus, the destruction of property and use of force arguably were necessary to carry out the search safely and effectively. The fact that a gun was found stuffed into the cushions of the chair in which Defendant was sitting when the police entered suggests as much: if officers had entered more gently, perhaps Defendant would have had a chance to draw his weapon and injure or kill an officer or be injured or killed himself.

Further, the search did not exceed the scope of the warrant, which weighs in favor of a conclusion of reasonableness. *See*

---

[4]The residence had two stories and a basement, with a concrete barrier at the rear separating the house from the I-205 freeway.

*United States v. Penn*, 647 F.2d 876, 882 n.7 (9th Cir. 1980) (en banc) ("A warranted search is unreasonable if it exceeds in scope or intensity the terms of the warrant."). The warrant authorized officers to search the house for guns, ammunition, and associated documents and paraphernalia, and they did just that. *See United States v. Becker*, 929 F.2d 442, 446 (9th Cir. 1991) (holding that, where warrant authorized search of the defendant's premises, it was reasonable for officers to use a jackhammer to break up a concrete slab in the backyard in order to search for evidence underneath).

On the other hand, the extent of the property damage, and particularly the use of two flash-bang devices, one of which seriously injured Defendant, weigh in favor of a conclusion of unreasonableness. *See id.* (noting that even where the search is within the scope of the warrant, it can be unreasonable because of its "intolerable intensity"). The record is unclear with respect to whether and why it was necessary to shoot out so many windows and break down so many doors. *Cf. San Jose Charter of the Hell's Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 974 (9th Cir. 2005) (holding that it was unreasonable for officers to cut a mailbox off its post, jackhammer the sidewalk, and break a refrigerator); *Mena v. City of Simi Valley*, 226 F.3d 1031, 1041 (9th Cir. 2000) (holding that it was unreasonable for officers to break down doors that they already knew were open). And in *Boyd*, 374 F.3d at 779, we held that, "given the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment to throw it 'blind' into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury." It is not clear that the officers took all appropriate and available measures to reduce the risk of injury here. For instance, Officer Forsyth testified at the suppression hearing that he was trained to deploy the flash-bang device away from the outer walls of rooms and away from furniture and curtains that could catch on fire, so he aimed for the center of the room. Although his

concern for fire safety was valid, Forsyth threw the flash-bang close to Defendant.

**[5]** Ultimately, we need not determine whether the entry was unreasonable because we agree with the district court that suppression is not appropriate in any event. The alleged Fourth Amendment violation and the discovery of the evidence lack the causal nexus that is required to invoke the exclusionary rule.

**[6]** The principle that the exclusionary rule applies only when discovery of evidence results from a Fourth Amendment violation is well-established. *See, e.g.*, *Hudson*, 126 S. Ct. at 2164 ("[B]ut-for causality is . . . a necessary . . . condition for suppression."); *Segura v. United States*, 468 U.S. 796, 804 (1984) (noting that the exclusionary rule reaches "evidence obtained as a direct result of an illegal search or seizure," or "found to be derivative of an illegality"); *United States v. Pulliam*, 405 F.3d 782, 791 (9th Cir. 2005) (denying suppression because "the indispensable causal connection" between the unlawful act and discovery of the evidence was absent).

**[7]** *United States v. Ramirez*, 523 U.S. 65 (1998), is instructive. There, the police obtained a no-knock warrant to search a home. Approximately 45 officers gathered, announced by loudspeaker that they had a search warrant, broke one window in the garage, and pointed a gun through the opening. The Supreme Court noted that "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the *fruits of the search are not subject to suppression*." *Id.* at 71 (emphasis added). Although the Court concluded that the police conduct in that case did not violate the Fourth Amendment, the Court noted that, had the search been unreasonable, it then would have had to determine "whether . . . there was [a] sufficient *causal relationship* between the breaking of the window and the discovery of the

guns to warrant suppression of the evidence." *Id.* at 72 n.3 (emphasis added).

**[8]** Here, the discovery of the guns was not causally related to the manner of executing the search. The police had a warrant, the validity of which is not questioned, and the guns, money, and other contraband were not hidden. Even without the use of a flash-bang device, rubber bullets, or any of the other methods that Defendant challenges, "the police would have executed the warrant they had obtained, and would have discovered the [evidence] inside the house." *Hudson*, 127 S. Ct. at 2164; *cf. United States v. Hector*, 474 F.3d 1150, 1155 (9th Cir. 2007) (holding that suppression was inappropriate where "[t]he causal connection between the failure to serve [a] warrant and the evidence seized is highly attenuated, indeed non-existent"). Accordingly, we affirm the district court's denial of Defendant's motion to suppress the evidence.[5]

B.    *Multiplicitous Convictions*

Defendant asserts that three of the four counts of being a felon in possession of a firearm should have been dismissed prior to sentencing because they were multiplicitous. We review de novo whether a sentence is multiplicitous, unless the defendant fails to raise the issue before the district court, in which case review is for plain error. *United States v. Smith*, 424 F.3d 992, 999-1000 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1477 (2006). Under either standard, we agree with Defendant.

---

[5]The dissent's assertion that, "under the majority's approach even the most outrageous methods employed by invading officers would be irrelevant so long as the officers had obtained a warrant," dissent at 11494, is overstated. Separate from the question of exclusion, "42 U.S.C. § 1983 and the *Bivens* doctrine have made tort damages an effective remedy for constitutional violations by federal or state law enforcement officers." *United States v. Langford*, 314 F.3d 892, 895 (7th Cir. 2002).

**[9]** In *United States v. Szalkiewicz*, 944 F.2d 653, 653-54 (9th Cir. 1991) (per curiam), we held that, regardless of the number of firearms involved, there is only one offense of being a felon in possession unless there is a showing that the firearms were "stored or acquired at different times and places." Further, the separateness of acquisition or possession must be found by a jury (or, presumably, admitted by the defendant). *Id.*; *see also United States v. Keen*, 104 F.3d 1111, 1118 n.11 (9th Cir. 1997) (same).

**[10]** The indictment in this case makes no reference to separate acquisition or possession of the four firearms. Defendant was charged with possessing each of the firearms on November 20, 2003. His written plea and plea colloquy made no reference to separate acquisition or possession. The government concedes that it presented no evidence of separate acquisition or possession. Instead, the government argues that, because Defendant moved to dismiss the allegedly multiplicitous counts only *after* his guilty plea was accepted, he waived any claim of error with respect to the indictment, and any objection to his sentence may be reviewed only for plain error.

The government's procedural argument is unpersuasive. The defendant in *Szalkiewicz* similarly did not object to the multiple counts of felon in possession in the indictment—and, indeed, any objection to the indictment presumably would have been overruled because the government still would have had the opportunity to present proof of separate acquisition and possession. Defendant lodged his objection at the appropriate time, after the government had missed that opportunity. The plain error standard applies when the defendant failed to raise the issue of multiplicitous sentences in the district court, which was not the case here. *See Smith*, 424 F.3d at 1000.

Further, even if the plain error standard did apply, *see United States v. Olano*, 507 U.S. 725, 732 (1993) (explaining that plain error is error that is plain and that affects substantial rights), Defendant's conviction of multiple counts of being a

felon in possession of a firearm, rather than a single count, harmed his substantial rights, *see Guam v. Torre*, 68 F.3d 1177, 1180 (9th Cir. 1995) (noting that "multiple convictions, apart from concurrent sentences, carry 'adverse collateral consequences that may not be ignored' " (quoting *Ball v. United States*, 470 U.S. 856, 864-65 (1985))).

**[11]** Accordingly, we remand with instructions for the district court to dismiss all but one count of being a felon in possession of a firearm.

## C.  *Predicate Felonies for the ACCA*

As an initial matter, Defendant's argument that prior convictions must be alleged in the indictment and either admitted or proved beyond a reasonable doubt to a jury is foreclosed by *Almendarez-Torres v. United States*, 523 U.S. 224, 243-47 (1998). Defendant's argument that we should invoke the doctrine of constitutional doubt to avoid *Almendarez-Torres* is foreclosed by *United States v. Grisel*, No. 05-30585, slip op. at 6740-41 (9th Cir. June 5, 2007) (en banc).

Defendant also argues that several of his prior convictions do not qualify as predicate felonies under the ACCA. We review that claim de novo, *United States v. Marks*, 379 F.3d 1114, 1116 (9th Cir. 2004), and hold that the prior convictions do qualify as predicate felonies under the ACCA.

To qualify for a sentence enhancement under the ACCA, a defendant must have three or more prior convictions for violent felonies or serious drug offenses. 18 U.S.C. § 924(e)(1). The government alleged three prior convictions: a 2002 conviction for delivery of a Schedule II controlled substance under Oregon law, a 1998 conviction for delivery of a Schedule II controlled substance under Oregon law, and a 1977 conviction for Robbery II under Oregon law.

**[12]** Defendant contends that his two prior drug offenses do not qualify as predicate felonies under the ACCA, because the

maximum punishment for those offenses under the Oregon Sentencing Guidelines is less than 10 years. The ACCA provides that, in order to count as a "serious drug offense," the maximum term of imprisonment "prescribed by law" must be ten years or more. 18 U.S.C. § 924(e)(2)(A). Delivery of a Schedule II controlled substance is a Class B felony under Oregon law, Or. Rev. Stat. § 475.840(1)(b), and the maximum sentence allowed by statute is 10 years, Or. Rev. Stat. § 161.605(2). Nonetheless, Defendant argues that the maximum sentence under the Oregon Sentencing Guidelines is the maximum term "prescribed by law." Defendant's argument is foreclosed by *United States v. Parry*, 479 F.3d 722, 724-25 (9th Cir. 2007). The district court properly found that Defendant's drug convictions were predicate felonies under the ACCA.

Defendant also contends that his 1977 robbery conviction does not qualify as a violent felony under the ACCA because he was 17 years old at the time of that offense; the ACCA defines the term "violent felony" to include "any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device," 18 U.S.C. § 924(e)(2)(B); and the indictment and judgment do not prove that he used or carried a firearm.

It is irrelevant whether Defendant used or carried a firearm, because the documents associated with the 1977 robbery show that Defendant was prosecuted as an adult, rather than as a juvenile. Had Defendant not been prosecuted as an adult, the information would not have alleged a violation of Oregon Revised Statute section 164.405, and there would not be a judgment of conviction for Robbery II—instead, there would be only an adjudication of juvenile delinquency. *See* Or. Rev. Stat. ch. 419C (juvenile code provisions concerning delinquency); *cf. State v. Lawler*, 927 P.2d 99, 103 (Or. Ct. App. 1996) ("[A]n adult criminal prosecution is not initiated by filing a delinquency petition."). Section 924(e)(2)(B) concerns only an act "of juvenile delinquency," a term of art that does

not encompass the criminal conviction of a juvenile who was prosecuted in adult court. *See* 18 U.S.C. § 5032 (discussing the transfer of a juvenile for prosecution in adult court in lieu of prosecution for juvenile delinquency).

**[13]** The only remaining question is whether Robbery II under Oregon law is a violent felony for purposes of the ACCA. The ACCA defines a "violent felony" as "any crime punishable by imprisonment for a term exceeding one year . . . that has as an element the use, attempted use, or threatened use of physical force against the person of another." 18 U.S.C. § 924(e)(2)(B)(i). Oregon's Robbery II statute provides:

> (1) A person commits the crime of robbery in the second degree if the person violates ORS 164.395 and the person:
>
> (a) Represents by word or conduct that the person is armed with what purports to be a dangerous or deadly weapon; or
>
> (b) Is aided by another person actually present.
>
> (2) Robbery in the second degree is a Class B felony.

Or. Rev. Stat. § 164.405. In turn, Oregon Revised Statute section 164.395 provides that a person commits robbery

> if in the course of committing or attempting to commit theft . . . the person uses or threatens the immediate use of physical force upon another person with the intent of:
>
> (a) Preventing or overcoming resistance to the taking of the property or to retention thereof immediately after the taking; or

(b) Compelling the owner of such property or another person to deliver the property or to engage in other conduct which might aid in the commission of the theft . . . .

Under the categorical approach described in *Taylor v. United States*, 495 U.S. 575, 602 (1990), we look only to the fact of conviction and the statutory definition of the offense to determine whether it was a violent felony. The Oregon statutory definition of second-degree robbery contains the required element of use, attempted use, or threatened use of physical violence. *See United States v. Melton*, 344 F.3d 1021, 1026 (9th Cir. 2003) (holding that where the state's definition of robbery has on its face the element of use or threatened use of physical force, a robbery conviction is properly used as a predicate under ACCA). We therefore hold that a conviction for second-degree robbery under Oregon law constitutes a violent felony for purposes of ACCA.

Thus, the district court properly found that Defendant's prior convictions were predicate felonies under ACCA.

D.   *Career Offender Guideline*

U.S.S.G. § 4B1.1 (2003)[6] establishes that a defendant is a career offender if the defendant was at least 18 years old at the time of the instant offense, the instant offense is a felony and either a crime of violence or a controlled substance offense, and the defendant has at least two prior felony convictions for crimes of violence or controlled substance offenses. Defendant argues that the Career Offender Guideline should not have been applied to him, because the instant offense was not a crime of violence. We review de novo the district court's interpretation and application of the Sentencing Guidelines. *United States v. Nielsen*, 371 F.3d 574, 582 (9th Cir. 2004).

---

[6]Defendant was sentenced under the 2003 Sentencing Guidelines.

Defendant is correct with respect to the counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). " 'Crime of violence' does not include the offense of unlawful possession of a firearm by a felon . . . ." U.S.S.G. § 4B1.2 cmt. n.1; *see also Stinson v. United States*, 508 U.S. 36, 45-47 (1993) (holding that Sentencing Guidelines commentary must be given controlling weight unless it violates the Constitution or a federal statute, or is plainly inconsistent with the Guidelines itself). However, Defendant is incorrect with respect to the count of possessing an unregistered sawed-off shotgun in violation of 26 U.S.C. § 5861(d). "The possession of an unregistered firearm of the kind defined in [26 U.S.C.] § 5845 . . . involves the substantial risk of violence necessary to label the possession a crime of violence," *United States v. Dunn*, 946 F.2d 615, 621 (9th Cir. 1991), and Defendant's sawed-off shotgun is of the type described in § 5845(a).[7]

**[14]** The district court therefore should have applied the Career Offender Guideline only to Count 4, possession of an unregistered sawed-off shotgun. Instead, the district court erred by imposing a Career Offender sentence on all counts. If a district court incorrectly applies the Sentencing Guidelines and its error is not harmless, then we vacate the sentence and remand for resentencing. *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006); *see also United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (holding that any error was harmless because, "under the unusual circum-

---

[7]The 2004 commentary to U.S.S.G. § 4B1.2 explicitly provides that being a felon in possession of the type of firearm described in 26 U.S.C. § 5845(a) *is* a crime of violence. If this change from the 2003 Guidelines is "clarifying" rather than "substantive," it applies retroactively. *United States v. Morgan*, 376 F.3d 1002, 1010 (9th Cir. 2004). We need not decide whether the amendment applies retroactively, though, because the government—despite later assertions to the contrary—never argued in briefing or oral argument that the amendment should apply retroactively. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

stances present in this third-time appeal, we recognize that the district court could—and would—impose the same sentence again"). Here, we cannot say with certainty that Defendant would not have received a lower sentence if the district court had calculated his Guidelines range properly. Accordingly, we remand for resentencing.

Convictions AFFIRMED, except for the multiplicitous felon-in-possession convictions, which are REVERSED; sentence VACATED; REMANDED for resentencing.

---

REINHARDT, Circuit Judge, dissenting:

## I.   Introduction

I agree with the majority that the law enforcement officers' entry into David Kelly Ankeny's home without complying with the constitutional "knock and announce" requirements does not necessitate suppression of the evidence. *See* Maj. Op. at 11473-74. After *Hudson v. Michigan*, 126 S. Ct. 2159 (2006), such a knock-and-announce violation no longer justifies the remedy of suppression. *Id.* at 2168. Because I conclude, however, that the intensive and violent search that ensued was unreasonable due to the extreme use of excessive force and that the evidence seized during the unlawful search should be suppressed, I am compelled to dissent.

The majority avoids determining whether the military-style invasion of Ankeny's home, with the concomitant destruction of physical property and infliction of serious personal injuries, violated Ankeny's Fourth Amendment rights. It does so by holding that regardless of how unlawful the law enforcement officers' actions may have been, "suppression is not appropriate," because "[t]he alleged Fourth Amendment violation and the discovery of the evidence lack the causal nexus that is required to invoke the exclusionary rule." Maj. Op. at 11477.

Contrary to the majority's view, however, the remedy of suppression is hardly inappropriate in a case such as this, where a search executed with excessive and unreasonable force *directly* results in the discovery of the seized evidence. Because the unlawful search *was* causally related to the discovery of the evidence, and because our prior cases hold that suppression may be appropriate when the *manner of the search* — and not just the initial entry or a "preliminary misstep," *Hudson*, 126 S. Ct. at 2164 — exceeds the terms of the warrant, I would hold that suppression is the proper remedy in Ankeny's case and therefore reverse his conviction.

## II.    *Hudson v. Michigan* **Should Not Be Extended**

In *Hudson*, the Supreme Court held that suppression is no longer a remedy for constitutional violations of the knock-and-announce requirement. 126 S. Ct. at 2168. The Court, however, was divided over the basis for its holding. Justice Kennedy, whose concurring opinion provided the *Hudson* majority's fifth vote, joined in parts I through III of Justice Scalia's opinion for the Court, but declined to join Part IV, which stated that "[a] trio of cases — *Segura v. United States*, 468 U.S. 796 (1984); *New York v. Harris*, 495 U.S. 14 (1990); and *United States v. Ramirez*, 523 U.S. 65 (1998) — confirms our conclusion that suppression is unwarranted in this case." *Hudson*, 126 S. Ct. at 2168; *id.* at 2171 (Kennedy, J., concurring). While Part IV of Justice Scalia's opinion attempts to link *Hudson*'s rejection of suppression as a remedy for violating the Fourth Amendment's knock-and-announce requirement to a broader trend abandoning the exclusionary rule in other contexts, Justice Kennedy's concurring opinion cuts very much in the opposite direction, cautioning that:

> *[T]he continued operation of the exclusionary rule, as settled and defined by our precedents, is not in doubt.* Today's decision determines *only* that in the specific context of the knock-and-announce require-

ment, a violation is not sufficiently related to the later discovery of the evidence to justify suppression.

*Id.* at 2170 (emphasis added).

In determining whether to extend *Hudson* beyond the "specific context," of the knock and-announce requirement, as the government asks us to do here, we should respect Justice Kennedy's instruction that "the continued operation of the exclusionary rule, as settled and defined by our precedents, is not in doubt." *Id.* In the Appendix to his dissenting opinion in *Hudson*, Justice Breyer provides a list of 41 Supreme Court decisions from 1914 to 2006 "requiring suppression of evidence seized (or remanding for lower court to make suppression determination) in a private home following an illegal arrest or search." *Id.* at 2186-88 (Breyer, J., dissenting). These decisions reflect the important rights that are at stake, as we consider whether suppression is the appropriate remedy for the unlawful violent search that occurred of Ankeny's private home. Although the majority purports not to extend the holding of *Hudson*, its opinion does extend *Hudson*, far beyond the "specific context of the knock-and-announce requirement . . . ." *Id.* at 2170 (Kennedy, J., concurring). Applying the test employed by Justice Kennedy, I would hold that in Ankeny's case the unconstitutional search is "sufficiently related to the later discovery of the evidence to justify suppression." *Id.* Indeed, here, there is no attenuation of any kind. It is the unlawful search itself that led directly to the discovery of the evidence at issue.

## III. Evidence May Be Suppressed Where, As Here, Officers Seize it as a Direct Result of a Search Executed with Unlawful Excessive Force

Although the majority correctly recognizes that "[u]nnecessary destruction of property or use of excessive force can render a search unreasonable," and states that "[w]hether this entry and search were conducted reasonably

is a close question," Maj. Op. at 11475, it ultimately avoids deciding that issue by holding that "[t]he alleged Fourth Amendment violation and the discovery of the evidence lack the causal nexus that is required to invoke the exclusionary rule." *Id.* at 11477. After citing several cases for the proposition that causality is a necessary condition for applying the exclusionary rule, the majority concludes that "the discovery of the guns was not causally related to the manner of executing the search," because "[t]he police had a warrant" and "[e]ven without the use of a flash-bang device, rubber bullets, or any of the other methods that Defendant challenges, 'the police would have executed the warrant they had obtained, and would have discovered the [evidence] inside the house.' " Maj. Op. at 11478 (quoting *Hudson*, 127 S. Ct. at 2164).

By holding that the exclusionary rule does not apply to searches conducted with excessive force, the majority overlooks our prior decisions that have applied or assumed the appropriateness of suppression when a "warranted search" is nevertheless rendered unreasonable because "it exceeds in scope or intensity the terms of the warrant." *United States v. Becker*, 929 F.2d 442, 446-47 (9th Cir. 1991) (quoting *United States v. Penn*, 647 F.2d 876, 882 n.7 (9th Cir. 1980) (en banc)); *see also United States v. Chen*, 979 F.2d 714, 717 (9th Cir. 1992). "[W]here there is a 'flagrant disregard' for the terms of the warrant, the district court may suppress all of the evidence, including evidence that was not tainted by the violation." *Chen*, 979 F.2d at 717 (quoting *United States v. Medin*, 842 F.2d 1194, 1199 (10th Cir. 1988)). These cases have never been overruled and they are in no respect inconsistent with *Hudson*. Because the intensity of the violent search of Ankeny's home demonstrated a "flagrant disregard" for the terms of the warrant, thereby turning it into a general warrant, it is necessary and appropriate to suppress the evidence that the officers seized pursuant to that warrant. *Id.*

### A. Discovery of the Guns is Causally Related to the Unlawful Search

Contrary to the majority's conclusion, the substantial Fourth Amendment violation in this case — the use of extreme and excessive force in the *search* (not merely the existence of an initial unlawful entry or a "preliminary misstep," *Hudson*, 126 S. Ct. at 2164) — was the *direct* cause of the discovery of the guns. Under the controlling law, where, as here, the discovery of the evidence is the "direct result of an unconstitutional search," the evidence is subject to exclusion. *Segura*, 468 U.S. at 804 ("Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion.").

In *Hudson*, as I have noted, the Court wrote that the knock-and-announce violation concerned only the "manner of entry" or a "preliminary misstep," 126 S. Ct. at 2164, which was followed by an "ensuing, lawful search . . . ." *Id.* at 2171 (Kennedy, J., concurring). As Justice Kennedy explained, when "a violation results from want of a 20-second pause but an ensuing, lawful search lasting five hours discloses evidence of criminality, the failure to wait at the door cannot properly be described as having caused the discovery of evidence." *Id.* (emphasis added). In this case, however, law enforcement officers executed the overall search that led directly to the seizure of the evidence with extreme and excessive force; indeed, the search was permeated with illegality. Given that the excessive force employed in this case rendered the entire search unlawful under the Fourth Amendment, the search bears no resemblance to the "lawful search" that followed the initial "entry" in *Hudson*. *Id.* Indeed, the facts and circumstances in this case are the polar opposite of those in *Hudson*. In short, *Hudson* is entirely inapplicable.

Moreover, the majority's own description of the events belies its conclusion that the unlawful search was not the cause of the discovery of Ankeny's weapons. After explaining

how the police broke down the door and entered the home, the majority then describes what happened inside the house subsequent to the unlawful entry. The law enforcement officers threw a flash bang device at Ankeny that exploded and badly burned him, secured the second floor, and threw a second flash bang device into an open area on that floor, setting on fire a bed in which two people were lying. Meanwhile, the officers shot bullets into the second story windows — indeed shot out ten windows. The majority then states that "[t]hereafter, the police recovered" two semiautomatic guns in the living room, a shotgun and a rifle in the upstairs bedroom, and another rifle in the basement. Maj. Op. at 11470-71 (emphasis added). Because the immediate direct result of the violent search at issue here was the discovery of the guns, it follows that the discovery of the guns was causally related to the unconstitutional search.[1] Unlike in *Hudson*, here there was no intervening lawful search that broke the chain of causation. Accordingly, the "exclusionary rule reaches . . . [the] primary evidence obtained as a direct result of [this] illegal search . . . ." *Segura*, 468 U.S. at 804 (citing *Weeks v. United States*, 232 U.S. 383 (1914)).

## B.   The Benefits of Excluding the Evidence Outweigh the Costs in Cases in Which Excessive Force Renders a Search Unconstitutional

In addition to the presence of causality, in this case the cost-benefit rationale, which was critical to *Hudson*'s rejection of the exclusionary rule for knock-and-announce violations, strongly favors the suppression of the evidence directly obtained by a search conducted with unlawful, excessive

---

[1]The majority, for some reason best known to its members, asserts that the property damage was done during the "entry" rather than during the "search." This is patently incorrect, and is in any event irrelevant. The principal excessive force was directed against persons, not property, and the force was applied *after* the officers had entered the dwelling and were in the process of executing the search warrant.

force. *See Hudson*, 126 S. Ct. at 2165-68. Although "the exclusionary rule has never been applied except where its deterrence benefits outweigh its substantial costs," *Id.* at 2165, the benefits of suppressing the fruits of military-style searches conducted with excessive force that may cause serious destruction to the home and serious injuries and the risk of death to occupants and guests, both adults and children, far outweigh the costs.

Compared to the "costs" of allowing suppression for the knock-and-announce rule, which Justice Scalia's opinion asserts would set dangerous criminals free for trivial reasons and generate a constant flood of such claims, *id.* at 2165-66, the type of claim asserted by Ankeny should arise rarely and therefore would be unlikely to produce a swarm of cases involving excessive force searches. Also, officials and courts are far more competent to discern which extraordinary tactics constitute excessive force than to determine in the heat of the moment "what constitute[s] a reasonable wait time in a particular case" before entering — usually a matter of calculating, wholly subjectively the appropriate number of seconds. *Id.* at 2166 (internal quotations and citations omitted). In fact, without any difficulty, we have in the past in a case remarkably similar to the one before us struck down, as constituting excessive force, specific tactics such as the ones used in the case before us. *See, e.g.*, *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004) (holding that officers had employed "constitutionally excessive" force by "blindly" throwing a flash bang grenade into an apartment occupied by five to eight individuals). Finally, on the cost side, the knock-and-announce rule could deprive some officers of their ability to make on the spot discretionary judgments on the basis of their experience and cause them to "wait longer than the law requires." *Hudson*, 126 S. Ct. at 2166. The tactical decision whether to use massive, excessive military type force, however, is ordinarily made after full consultation well before the officers execute a warrant. In fact, the record here reveals that officers discussed for weeks how to arrest Ankeny and what

tactics would be employed. Because of the opportunity for careful, deliberate planning, it is possible to minimize the risks to officers while at the same time ensuring the protection of individual constitutional rights.

As to the "deterrence benefits" of exclusion, in *Hudson* Justice Scalia's opinion did not seem to find much that was beneficial about suppression as the result of a violation of the knock-and-announce rule. *See Hudson*, 126 S. Ct. at 2166 (referring to the rule as "the right not to be intruded upon in one's nightclothes").[2] In the context of a search executed with excessive force, however, the benefits of deterrence are tremendous, and much greater than in *Hudson*. The principal benefits of deterrence are avoiding unnecessary destruction of private property and, most important, reducing the risk of serious injury and death to home owners, their families and their guests, including innocent children. In Ankeny's case, rubber bullets rained through the windows, and one set of officers caused Ankeny serious injury by throwing a flash bang device toward him that burned him badly, while a second group of officers set a bed occupied by others on fire by hurling a second flash bang device in their direction. At the time the officers launched their assault, they were aware that a one-year-old child was an occupant of the house and in fact when the attack began the one-year-old was present. Certainly, the right not be set afire or killed "in one's nightclothes" is far more grave and worthy of protection than the "right not to be intruded upon in [that attire]." *Id.* at 2167.

Although the fear of a lawsuit under 42 U.S.C. § 1983 may deter some officials from engaging in such dangerous and

---

[2]Five Justices, however, expressed the view that the knock-and-announce rule protects far greater interests and values than Justice Scalia's opinion acknowledged. *See id.* at 2170 (Kennedy, J., concurring) (stating that "privacy and security in the home are central to the Fourth Amendment's guarantees," and stating that "[s]ecurity must not be subject to erosion by indifference or contempt."); *id.* at 2180 (Breyer, J., dissenting).

warlike conduct, I do not believe that the potential for civil damages would sufficiently deter law enforcement officers from using the type of excessive force at issue here. *See id.* at 2167-68 (stating that "[a]s far as we know, civil liability is an effective deterrent" to knock-and-announce violations). It is the official for whom the fear of civil liability is not ordinarily an effective deterrent that suppression is a necessary remedy in order to ensure compliance with the Fourth Amendment. One would expect that only the most belligerent of law enforcement officials, at whatever level, or those most disdainful of individual rights, would employ the type of force applied by the officers in this case. It is such officials, however, who are least likely to be deterred by civil liability alone, especially in light of the general practices regarding indemnification.[3] Moreover, informing law enforcement officials *a priori* that suppression will *never* be an available remedy if they first obtain a warrant, regardless of how excessive or destructive the invasion and search of the house, would serve only to encourage some individuals to unleash overwhelming force on our citizens in contravention of the Fourth Amendment.

Finally, the facts of this case demonstrate a lack of professionalism and disdain for the rights of individuals on the part of some law enforcement officers that is not likely to be cured by the possibility of a § 1983 action. *Cf. Hudson*, 126 S. Ct. at 2168. The officers who executed the search were anything but professional in how they described, in text messages, "the fun" and the "good time had by all" when they caused

---

[3]"[P]olice officials are usually insulated from any economic hardship associated with lawsuits based on conduct within the scope of their authority. . . . . Police officers are generally provided free counsel and are indemnified for conduct within the scope of their authority." *Briscoe v. Lahue*, 460 U.S. 325, 366 & n.38 (1983) (Marshall, J., dissenting) (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 713 (1978) (Powell, J., concurring); Project, *Suing the Police in Federal Court*, 88 YALE L. J. 781, 810 (1979)); *accord* PETER H. SCHUCK, SUING GOVERNMENT: CITIZEN REMEDIES FOR OFFICIAL WRONGS 83-88 (1983).

Ankeny to suffer serious burns. In three text messages, officers wrote to each other:

> (1) "SORRY TIM, WE WERE JUST JUMPING OFF . . IT WAS 936 NE . . . BIG FUN!"; (2) "IT WAS CRAZY . . . FUN HAD BY ALL . . . WELL EXCEPT FOR THE GUY WHO LAID ON THE FLASHBANG . . . 2ND DEGR BURNS . . . MISSING HALF A MUSTACHE"; (3) "BIG TIME FUN!! LOTS OF BROKEN GLASS, BAD GUY JUMPED ON THE FLASHBANG, GOOD TIME HAD BY ALL."

In sum, the costs of suppressing evidence in cases of excessive force are far less substantial than those in *Hudson*, whereas the benefits of deterrence, namely the protection of human life and property, are far more significant. Indeed, our analysis confirms that the exclusionary rule is not only appropriate, but absolutely necessary, to protect men, women, and children whose physical well being and very lives may be placed in jeopardy by the intentional and calculated use of excessive force in violation of the Fourth Amendment.

### C. The Majority's Holding Will Lead to Unacceptable Results and is Unsupported by the Cases Upon Which It Relies

Although the majority does not explicitly state or hold that suppression may *never* be a remedy for the use of excessive force while executing a warrant, its causality argument followed to its logical conclusion does just that — it creates a blanket exception to the exclusionary rule for unreasonably executed searches *whenever* the officers possess a valid search warrant. This, of course, will inevitably lead to most unfortunate consequences, because under the majority's approach even the most outrageous methods employed by invading officers would be irrelevant so long as the officers had obtained a warrant. Certainly, at least five members of the

*Hudson* Court could not have intended a result so contrary to our fundamental Fourth Amendment precepts.

The cases cited by the majority do not support its holding. *See* Maj. Op. at 11477. First, as noted above, *Hudson* is inapposite because it involved a *lawful search* following a preliminary misstep or initial entry, whereas the search of Ankeny's home involved an *unlawful search* that directly resulted in the discovery of the weapons.[4]

Second, reliance on *Segura v. United States*, 468 U.S. 796 (1984), is similarly misplaced in this case, just as five Justices found such reliance unhelpful in *Hudson. See Hudson*, 126 S. Ct. at 2171 (Kennedy, J., concurring); *id.* at 2183 (Breyer, J., dissenting). *Segura* involved an illegal warrantless entry, followed 19 hours later by a lawful search pursuant to a lawful warrant that the police obtained in the interim with information that was unrelated to the warrantless entry. The Court

---

[4]Although the majority claims that *United States v. Ramirez*, 523 U.S. 65 (1998) "bears some similarity to this case," it is inapposite for the same reason as *Hudson* — it involved only the "manner in which the entry was accomplished," the breaking of a single window of the defendant's garage, and not an unlawful search. *Id.* at 71. Moreover, to construe *Ramirez*, we must look to Justice Kennedy's concurring opinion in *Hudson*, in which he stated that the "application of the exclusionary rule depends on the existence of a 'sufficient causal relationship' between the unlawful conduct and the discovery of evidence." *Hudson*, 126 S. Ct. at 2171 (quoting *Ramirez*, 523 U.S. at 72 n.3). As I have explained above, such a causal connection exists here. To the extent that the majority relies upon the dictum in *Ramirez* that Justice Scalia endorsed in Part IV of *Hudson*, it errs. Justice Kennedy did not concur in that part of Justice Scalia's opinion. Moreover, the meaning of the dictum is far from clear. *See id.* at 2170 (" 'destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression.' "); Maj. Op. at 11477 (quoting the same dictum). The dictum suggests only that sometimes in cases in which an unlawful destruction of property occurs, there will be no justification for suppressing the evidence. That tells us little about the opposite circumstances — cases in which the use of excessive force taints a search sufficiently as to warrant such suppression.

refused to suppress the evidence, not because of a lack of causal relationship to the conduct of the search, but because the search was lawful in every respect. The search was conducted pursuant to what the Court determined to be a lawful warrant and was conducted in a lawful manner. *See id.* at 813-14. The attenuation applied only to the 19-hour-old initial entry. Here, of course, the entire point is that the search that produced the seized evidence was conducted with excessive force and was, accordingly, unlawful.

Third, *United States v. Hector*, 474 F.3d 1150 (9th Cir. 2007), does not compel the majority's holding. *Id.* at 1154-55 (holding that suppression is not an appropriate remedy for officers' failure to serve a warrant to the defendant before, during, or immediately after the search). If officers violate their obligation to serve the warrant by failing to present it "*immediately after* a search of a home," *id.* at 1154 (emphasis added) (quoting *United States v. Martinez-Garcia*, 397 F.3d 1205, 1212 n.3 (9th Cir. 2005)), it cannot be the but for cause of the seizure of evidence that has already occurred. Here, however, the excessive force that transformed what could have been a lawful search pursuant to a valid warrant into an unlawful search occurred directly before the officers recovered the evidence and also enabled the officers to retrieve the weapons more easily. Moreover, the deterrence benefits associated with suppressing evidence obtained through the use of excessive force are many times greater and far worthier of protection than the "relatively small [deterrence benefit] in the case of failure to present a copy of the warrant." *Id.* at 1155 (suggesting that once officers have obtained a valid warrant, they have little incentive to fail to present the warrant when they execute it).

Finally, to the extent that the majority opinion asserts that the evidence would have been discovered if the law enforcement officers had lawfully executed the warrant without excessive force, the argument does not advance its cause. It is often the case that officers who conduct an unlawful search

might instead have conducted a lawful one. That, however, is insufficient to establish a lack of causality or to render the unlawful search valid. To the contrary, if the search was illegal, we do not overlook the illegality on the ground that the search could have been conducted legally. Nor do we refuse to suppress evidence for that reason. For example, officers who conduct an unlawful warrantless search could often have obtained a warrant and lawfully executed it. We do not find an absence of a causal relationship between discovery of the evidence and the unlawful search in such circumstances. Rather, we suppress the evidence. *United States v. Reilly*, 224 F.3d 986, 995 (9th Cir. 2000) (suppressing evidence and refusing " 'to excuse the failure to obtain a search warrant where the police had probable cause but simply did not attempt to obtain a warrant.' ") (quoting *United States v. Mejia*, 69 F.3d 309, 320 (9th Cir. 1995)).

## D. The Search of Ankeny's Home Was Unreasonable

Having determined that suppression may be an appropriate remedy in an excessive force case, I would hold that in this case the "intolerable intensity" of the force employed rendered the search unreasonable. *Becker*, 929 F.2d at 446; *see also Boyd*, 374 F.3d at 778-79.

Ankeny contends that the tactics employed by officers constitute excessive force, including the deployment of 44 officers in the military style operation, the forcible entry of the home by means of a battering ram, the kicking down of the doors of every room in the house, the firing of myriad rubber bullets into the house shattering all the upstairs windows, and above all, the throwing of two "inherently dangerous" flash-bang devices towards three individuals, all with knowledge that a one year old infant was among the residents of the house. *Boyd*, 374 F.3d at 779. In this case, it is unnecessary, however, to look beyond the officers' use of the two flash-bang devices to hold that their "use of force was constitutionally excessive." In that respect, our decision in *Boyd* controls.

*Id.* There, we held that officers used excessive force when they threw a flash-bang device " 'blind' into a room occupied by innocent bystanders, absent a strong government interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury." *Id.* Here, one of the devices was hurled in Ankeny's direction as he was complying with the officers' instruction to him to get down on the floor. The other was then thrown toward a bed occupied by two individuals.

Compared to the deployment of the single flash-bang device in *Boyd*, the officers' use of two such devices in the instant action and the deliberate throwing of them in the direction of Ankeny and the two other occupants of the house whom the officers had no reason to believe had committed any offense was far more excessive. After breaking down the door with a battering ram, an officer demanded that Ankeny, who had been sleeping in a recliner in his living room, lie down on the floor. Although Ankeny did not resist or act in a threatening manner, an officer lobbed the flash-bang device towards him; as a result, the device exploded and caused first- and second-degree burns to his face and chest. Similarly, an officer who proceeded to an upstairs bedroom tossed a second device onto the floor by the edge of the bed where a man and a woman were lying, setting the bed on fire. If throwing a flash-bang device blindly into a room without warning is excessive, it is unquestionable that tossing these "explosive, incendiary weapon[s]" directly at three human beings without any notice, as the officers did here, constitutes constitutionally excessive force. *Id.* Also, as in *Boyd*, in which officers knew there were five to eight people sleeping in the apartment, *id.*, officers here knew that at least four to seven adults and a one-year-old child resided at Ankeny's home.[5] Moreover, the evidence of severe property destruction noted by the majority —

---

[5]The potentially dangerous circumstances that officers faced in searching the home in *Boyd* were also remarkably similar to — and if anything more perilous than — Ankeny's case, where police believed that Ankeny possessed a semi-automatic handgun. In *Boyd*, the officers believed that

the breaking of many windows and doors without a clear explanation as to any necessity — strengthens the conclusion that the search was unreasonable due to its "intolerable intensity." Maj. Op. at 11476. Certainly, there is no evidence in the record that suggests that the officers took any substantial steps to reduce the risk of injury. In my view, a military style invasion of the type that occurred here is justified only in rare circumstances and only as a last resort, at least where innocent civilians and children are known to be present in the house.

## IV. Conclusion

I reiterate here what we have stated before: "[n]owhere is the protective force of the fourth amendment more powerful than it is when the sanctity of the home is involved. . . . The sanctity of a person's home, perhaps our last real retreat in this technological age, lies at the very core of the rights which animate the amendment." *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 884 (9th Cir. 1990) (citations omitted). Bearing this principle in mind, as well as Justice Kennedy's firm statement in *Hudson* that "the continued operation of the exclusionary rule . . . is not in doubt," 126 S. Ct. at 2170 (Kennedy, J., concurring), I cannot agree that the mere fact that the police had a lawfully obtained search warrant bars this Court from suppressing the evidence directly discovered during the violent and unlawful search that actually occurred. Accordingly, I dissent.

---

the armed robbery suspect might be in the apartment, that a stolen .357 magnum might be there as well, that another potential occupant had tried to buy an assault rifle, and two "armed individuals" were witnessed leaving the apartment. 374 F.3d at 777. The danger created by these weapons was heightened by the fact that "the apartment had a loft from which a shooter could have placed the officers in a vulnerable position as they entered the apartment . . . ." *Id.* Despite such potential dangers, we held that the officers did not demonstrate the strong government interest that would permit officers to blindly deploy such an inherently dangerous device. *Id.* at 779.