PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSEPH EDWARDS,

*Defendant-Appellant.*

No. 10-4256

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:09-cr-00188-CCB-1)

Argued: September 23, 2011

Decided: December 29, 2011

Before MOTZ, KEENAN, and DIAZ, Circuit Judges.

Vacated and remanded by published opinion. Judge Keenan wrote the majority opinion, in which Judge Motz joined. Judge Diaz wrote a dissenting opinion.

## COUNSEL

**ARGUED:** Meghan Suzanne Skelton, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Greenbelt, Maryland, for Appellant. Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** James Wyda,

Federal Public Defender, Baltimore, Maryland, for Appellant. Debra L. Dwyer, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

## OPINION

BARBARA MILANO KEENAN, Circuit Judge:

Joseph Edwards was convicted of one count of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841. After the district court accepted Edwards' conditional guilty plea, the court sentenced him to a term of 120 months' imprisonment.

On appeal, Edwards contends that the district court erred in denying his motion to suppress evidence seized in the course of a police search of his person. The police search included an officer's use of a knife to cut a sandwich baggie containing suspected narcotics off Edwards' penis, an act performed at night on a public street. We conclude that the manner in which the search was conducted was unreasonable and, therefore, that the district court erred in denying Edwards' motion to suppress. We vacate Edwards' conviction and remand his case to the district court.

I.

On January 14, 2009 at 6:00 p.m., Shawnetta Layton and Vontraya Dixon went to the Northern District Police Station in Baltimore alleging that, four hours earlier, Layton's ex-boyfriend, Joseph Edwards, had threatened them by brandishing a firearm. Upon receiving this complaint, the Baltimore City police officer who initially spoke with Layton advised Detective Dennis Bailey that Edwards had used a gun in a domestic assault, and that officers were in the process of

obtaining a warrant for his arrest. Bailey was familiar with Edwards, and knew that Edwards had a criminal history involving the use or sale of illegal drugs.

Bailey and three other officers immediately attempted to locate Edwards, canvassing the neighborhoods that Edwards was known to frequent. At 11:15 p.m., the officers observed Edwards walking on a residential street. Although it was dark outside, there was a street lamp that provided some light allowing the officers to identify Edwards.

After the officers stepped out of their vehicle, Bailey asked Edwards to approach them. Bailey testified that the officers and Edwards "calmly" approached each other, and that the officers "weren't too worried," because Edwards "looked like he was just walking down the street." According to Bailey, Edwards did not exhibit any characteristics generally associated with an individual who is armed. He did not clutch at the waistband area of his pants, nor did the officers observe any "hand-to-hand" movements by Edwards that could have indicated the occurrence of a drug transaction. Bailey further testified that he did not have any information indicating that Edwards possessed any drugs at that time.

The officers detained Edwards and placed handcuffs on him, securing his arms behind his back.[1] Bailey testified that the officers placed Edwards in handcuffs to ensure their safety, based on their belief that Edwards might be armed. As Bailey contacted an employee at the police station to confirm that an arrest warrant had been executed, Edwards was seated on a curb. After being informed that the arrest warrant had been signed, Bailey told Edwards that he was under arrest.

---

[1]While Bailey did not testify regarding the precise manner in which the handcuffs were secured on Edwards, Ashley Keller, a neighbor who witnessed the officers' later search of Edwards, testified without contradiction that Edwards' "hands were behind his back."

Bailey requested a police transport van to take Edwards to the police station and, while waiting for the van to arrive, Bailey conducted a pat-down search of Edwards. Bailey testified that during the pat-down, he checked everywhere on Edwards' person where a weapon could be stored. Bailey did not find any weapons or contraband during the pat-down, nor did he feel any objects indicating that Edwards may be armed.

When the transport van arrived, the officers decided to search Edwards a second time before placing him into the van. While Bailey and three other male officers surrounded Edwards, Bailey unfastened Edwards' belt, loosened it, and pulled Edwards' pants and underwear six or seven inches away from his body.[2] The officers directed a flashlight beam inside both the front and the back of Edwards' underwear.

As they were looking inside Edwards' underwear, the officers saw that there was a plastic sandwich baggie tied in a knot around Edwards' penis. From Bailey's vantage point and with the assistance of the flashlight beam, Bailey could also see that the sandwich baggie contained smaller blue ziplock baggies, which contained "a white rocklike substance."[3] Based on his training and experience, Bailey concluded that the baggie and its contents were consistent with the packaging or distribution of a controlled substance.

Upon discovering the sandwich baggie tied around Edwards' penis, another officer held Edwards' pants and underwear open while Bailey put on gloves, took a knife that he had in his possession, and cut the sandwich baggie off Edwards' penis with the knife.[4] After Bailey cut the baggie,

---

[2]The district court found that the officers pulled Edwards' belt and his pants "away from [his] body," and found that "[t]here is no evidence that the pants were pulled down by the officers."

[3]In total, 43 smaller blue ziplock baggies were found in the sandwich baggie tied to Edwards' penis, which were later determined to contain a total of 2.98 grams of cocaine base.

[4]Nothing in the record suggests that Edwards suffered any physical injury as a result of this action.

he reached into Edwards' underwear and removed the baggie and its contents. During this procedure, Edwards remained in handcuffs with his hands secured behind his back.

Bailey testified that there were several reasons he conducted this second search before placing Edwards into the police van. Bailey stated that "[a] complete search is always your best option," because often "people hide things in those areas." Bailey also stated that because Edwards was being arrested for a handgun violation, Bailey thought that a more extensive search was warranted to ensure the safety of the officers, including the driver of the transport van. Finally, Bailey testified that he was aware of Edwards' criminal history, including that he previously had been arrested on drug charges. When asked whether it was customary for officers in Baltimore to search inside the underwear of arrestees, Bailey testified that "it's about 50 percent of the time, because nobody likes to do that search. You know, it's unpleasant for everybody involved. But if you have reason to believe that there might be something, then it's a good idea to check, because often they do hide things down there."

The officers conducted this search inside Edwards' underwear in the middle of the street beside the police transport van. Although Edwards was searched at 11:30 p.m., a streetlight partially illuminated the area. All four officers, each of whom was male, saw the drugs being removed from inside Edwards' underwear, but the district court found that only two officers, including Bailey, saw Edwards' penis during the course of the search.

Ashley Keller, a nearby resident who had known Edwards for many years, was standing at her doorway and saw Edwards being searched by the officers. She observed that the officers "patted [him] down mostly," and were "rambling with" and "feeling around" his pants. Keller noticed that Edwards' pants were lower than usual, but she could not see his genitals or his underwear.

Edwards ultimately was charged in a single-count indictment with possession with the intent to distribute cocaine base, in violation of 21 U.S.C. § 841. Edwards moved to suppress the evidence, arguing that the officers' search inside his underwear was unreasonable under the Fourth Amendment.

After a lengthy evidentiary hearing, the district court denied Edwards' motion. The district court found that Edwards' pants were only pulled out, not down, and that no members of the public were in a position to have seen Edwards' underwear or genitals. The district court concluded that the search was reasonable under the Fourth Amendment.

Edwards entered a conditional guilty plea to the charge, reserving the right to appeal the district court's ruling denying his motion to suppress. After the district court accepted Edwards' plea and imposed sentence on him, Edwards timely filed this appeal.

## II.

Edwards argues that the district court erred in denying his motion to suppress, because the search conducted inside his underwear was unreasonable under the Fourth Amendment. We review a district court's factual findings underlying a motion to suppress for clear error, and the court's legal determinations de novo. *United States v. Wardrick*, 350 F.3d 446, 451 (4th Cir. 2003). When a motion to suppress has been denied, we review the evidence in the light most favorable to the government. *United States v. Hamlin*, 319 F.3d 666, 671 (4th Cir. 2003).

We first address the preliminary question whether Edwards was subjected to a strip search. The government argues that the search conducted by the police was not a strip search but merely was a search of Edwards' "dip," or waistband, area. We disagree with the government's argument.

We conclude that the search conducted inside Edwards' underwear is properly characterized as a strip search, which includes "the exposure of a person's naked body for the purpose of a visual or physical examination." *Amaechi v. West*, 237 F.3d 356, 363 (4th Cir. 2001). A movement of clothing to facilitate the visual inspection of a suspect's naked body, as occurred here, is a standard example of a strip search. *See Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 957-58 (9th Cir. 2010); *Kelsey v. Cnty. of Schoharie*, 567 F.3d 54, 62 (2d Cir. 2009); *Blackburn v. Snow*, 771 F.2d 556, 561 n.3 (1st Cir. 1985). A suspect need not have been fully undressed for the search to have characteristics of, or be treated as, a strip search. *See Amaechi*, 237 F.3d at 363; *United States v. Dorlouis*, 107 F.3d 248, 256 (4th Cir. 1997) (treating officer's act of pulling down suspect's trousers, without removing suspect's boxer shorts, as strip search); *see also Wood v. Hancock Cnty. Sheriff's Dep't*, 354 F.3d 57, 63 n.10 (1st Cir. 2003) (recognizing that "a strip search may occur even when an inmate is not fully disrobed").

We also find instructive the Supreme Court's recent characterization of a strip search in *Safford Unified School District No. 1 v. Redding*, ___ U.S. ___, 129 S. Ct. 2633 (2009). The Court held that a school official's order that a student "remove her clothes down to her underwear, and then 'pull out' her bra and the elastic band on her underpants. . . . in the presence of the two officials who were able to see her necessarily exposed breasts and pelvic area to some degree," constituted a search that could be fairly called a "strip search." *Id.* at 2641; *see also Edgerly*, 599 F.3d at 957-58 n.16 (discussing *Redding*).

The manner and scope of the search at issue in *Redding*, like the search we consider in the present case, resulted in the pulling outward of the suspect's underwear, and the exposure of the suspect's pelvic area. Although this case presents certain factual differences from the search at issue in *Redding*, the many similarities in the manner in which the searches

were conducted further supports our conclusion that the police officers in the present case conducted a strip search of Edwards' person.

## III.

We apply well-settled principles of constitutional law in considering the reasonableness of the search of Edwards' genital area. Most notably, the very text of the Fourth Amendment expressly imposes the requirement that all searches and seizures be reasonable. *Kentucky v. King*, ___ U.S. ___, 131 S. Ct. 1849, 1856 (2011).

An officer may search the person of an arrestee, and the area within the arrestee's immediate control, without a search warrant based on the need to disarm the arrestee and to discover evidence. *Illinois v. Lafayette*, 462 U.S. 640, 644-45 (1983). However, all searches, including searches incident to an arrest, must be reasonable to withstand Fourth Amendment scrutiny. *Amaechi*, 237 F.3d at 361.

We further observe that the Supreme Court's analysis in *Bell v. Wolfish*, 441 U.S. 520, 559 (1979) is material to our resolution of this case. In *Bell*, the Supreme Court developed "a flexible test" to determine the reasonableness of a broad range of "sexually invasive searches," which included but was not limited to strip searches. *Amaechi*, 237 F.3d at 361 n.11 & 364 n.14 (citing *Bell*, 441 U.S. 520); *see also BNSF Ry. Co. v. U.S. Dep't of Transp.*, 566 F.3d 200, 208 (D.C. Cir. 2009) (noting that "the balancing inquiry remains the same" irrespective whether search is labeled as a strip search, or merely as a search). Therefore, we employ the reasonableness test set forth in *Bell*, because Edwards was subjected to a search that falls within that broad category of "sexually invasive searches."

## IV.

Under the *Bell* framework for determining the reasonableness of sexually invasive searches, the need for a particular

search is balanced against the invasion of personal rights caused by the search. 441 U.S. at 559. Pursuant to *Bell*, we examine the search in its complete context and consider the following factors: 1) the place in which the search was conducted; 2) the scope of the particular intrusion; 3) the manner in which the search was conducted; and 4) the justification for initiating the search. *Id.*

We first consider the location of the search. The question whether a sexually invasive search is conducted in a private or a public setting is "especially relevant" to this Court's determination of reasonableness. *Polk v. Montgomery Cnty.*, 782 F.2d 1196, 1201-02 (4th Cir. 1986).

We have "repeatedly emphasized the necessity of conducting a strip search in private." *Amaechi*, 237 F.3d at 364. While every strip search need not be conducted in a private holding cell to adequately safeguard a suspect's privacy interests, we consider whether a sexually invasive search could have been viewed by others, and whether it was in fact viewed by others, in our analysis of the reasonableness of the search. *See Logan v. Shealy*, 660 F.2d 1007, 1014 (4th Cir. 1981).

Because Bailey conducted the strip search of Edwards in the middle of a public, residential street, the search could have been viewed by others and, thus, was not conducted in a private setting. However, based on our conclusion that other factors of the *Bell* test are determinative of this appeal, we do not address whether the location of the search affected its reasonableness.

Under *Bell*, the reasonableness of the search also depends on the scope of the particular intrusion and the manner in which the search was conducted. *Bell*, 441 U.S. at 559; *Amaechi*, 237 F.3d at 361. Edwards contends that the scope of the intrusion was extensive because the officers inspected his genitals. Edwards further maintains that the manner in which the search was conducted was unreasonable, because

Bailey cut the sandwich baggie off Edwards' penis with a knife while Edwards was restrained in handcuffs, an act that could only cause fear and humiliation.

In response, the government argues that the scope and manner of the search were reasonable, because Edwards' pants and underwear were only pulled out, rather than down, and the officers did not conduct a visual or physical examination of Edwards' body cavities. We disagree with the government's position, because the drugs were removed from Edwards' person in an unnecessarily dangerous, and thus unreasonable, manner.

The manner in which contraband is removed from a suspect during a sexually intrusive search, no less than the manner in which the contraband initially is discovered, must be considered in determining under the *Bell* analysis whether the search was reasonable.[5] *Bell*, 441 U.S. at 559-60; *see United States v. Hambrick*, 630 F.3d 742, 748 (8th Cir. 2011); *United States v. Williams*, 477 F.3d 974, 975-76 (8th Cir. 2007). Thus, the

---

[5]While we address Detective Bailey's removal of the baggie from Edwards' penis as an issue which impacts the reasonableness of the search rather than as a seizure, our analysis would be the same whether the removal were characterized instead as a seizure. We recently addressed the distinction, noting that "[a] search compromises the individual interest in privacy," while a seizure "would . . . invade the owner's possessory interest." *United States v. Williams*, 592 F.3d 511, 521 (4th Cir. 2010) (quoting *Horton v. California*, 496 U.S. 128, 133-34 (1990)). Because we conclude, however, that the *manner* in which Bailey removed the baggie rendered his actions unreasonable under the Fourth Amendment, our analysis and conclusion are unaffected by the above distinction. As stated above, under the *Bell* analysis, the manner in which a particular sexually invasive search is conducted is a factor bearing on the reasonableness of that search. *See* 441 U.S. at 559. Had the removal of the baggie been characterized as a seizure instead, we similarly would be required to hold the manner of the seizure unreasonable, because "the manner in which the seizure . . . was conducted is, of course, as vital a part of the inquiry as whether it was warranted at all," *United States v. Place*, 462 U.S. 696, 707-08 (1983) (internal brackets omitted).

reasonableness of a sexually intrusive search depends in part on the manner in which the search was conducted and the consideration given to the privacy interests of the suspect. *See Lafayette*, 462 U.S. at 645; *United States v. Ashley*, 37 F.3d 678, 681-82 (D.C. Cir. 1994).

The safety of the suspect must be considered as well. A search that is theoretically permissible in one context may be impermissible in another if it is conducted in a cruel, painful, or dangerous manner. *See United States v. Braks*, 842 F.2d 509, 511-13 (1st Cir. 1988) (considering "whether the type of search exposes the suspect to pain or danger," in court's analysis of invasiveness of search, and upholding search in part because it did not result in "pain or danger" to defendant); *United States v. Sandler*, 644 F.2d 1163, 1167 (5th Cir. 1981) (en banc) (considering whether search was painful or dangerous in analyzing invasiveness of search).

We further observe that, in fashioning the *Bell* test, the Supreme Court cited its decision in *Schmerber v. California*, 384 U.S. 757 (1966). *Bell*, 441 U.S. at 559. In *Schmerber*, the Court held reasonable a search drawing blood from the body of a suspect charged with driving under the influence of alcohol, and relied in part on the fact that the procedure involved "virtually no risk, trauma, or pain," and did not raise any concerns regarding the suspect's "fear" or "health." 384 U.S. at 771-72. Thus, we conclude from the Supreme Court's analysis in *Bell* that these factors discussed in *Schmerber* also are relevant in considering the reasonableness of the manner in which a sexually invasive search is conducted.

Other courts also have emphasized that sexually invasive searches are not to be conducted in a manner likely to instill fear in the suspect. *See Evans v. Stephens*, 407 F.3d 1272, 1281 (11th Cir. 2005) (en banc); *cf. Richmond v. City of Brooklyn Ctr.*, 490 F.3d 1002, 1008 (8th Cir. 2007) (strip searches should be hygienic, and should not be performed in degrading, humiliating, or abusive fashion). In view of the

above authorities, we conclude that once contraband is discovered in the course of a sexually invasive search, the contraband may not be seized in a manner that poses an unnecessary risk of harm to the person being searched.

The facts of the present case show that during the course of the search, Edwards' hands were restrained in handcuffs behind his back as they had been since the officers first detained him. When Bailey discovered the sandwich baggie containing suspected contraband tied to Edwards' penis, Bailey dropped his flashlight, obtained a knife, and put on gloves, while another officer continued to hold open Edwards' pants and underwear. Without the aid of the flashlight, Bailey took the knife and cut the sandwich baggie off Edwards' penis.

We conclude that Bailey's use of a knife in cutting the sandwich baggie off Edwards' penis posed a significant and an unnecessary risk of injury to Edwards, transgressing well-settled standards of reasonableness. The fortuity that Edwards was not injured in the course of this action does not substantiate its safety. The district court found that the entire search took place at "approximately 11:30 [at night], in a dark area." While the officers used a flashlight when searching inside Edwards' underwear, they did not continue to use the flashlight when Bailey removed the baggie containing the suspected drugs with his knife.

The government argues, nonetheless, that the additional factor in the *Bell* analysis, the justification for the search, establishes that the search was reasonable. *See* 441 U.S. at 559. The government contends that because Bailey knew that Edwards was being arrested for a handgun violation, the search inside Edwards' underwear was reasonable to ensure that the police had not missed finding a weapon during the earlier pat-down search.

We conclude that the government's rationale is not persuasive because it effectively asks that we validate the entire

search, irrespective of the actions that transpired during its course, based on the initial justification for the search. We are not permitted, however, to disregard conduct that occurs after a search has begun in our evaluation of the constitutional validity of that search. *See Bell*, 441 U.S. at 559-60. Moreover, assuming, without deciding, that the government's rationale supports the reasonableness of the decision to search inside Edwards' underwear, this rationale does not justify the dangerous manner in which the contraband was retrieved from his genital area once the contraband was discovered. In fact, the government provides no reason whatsoever why the concealed contraband, once the police had determined that it clearly was not a handgun, could not have been removed under circumstances less dangerous to Edwards.

We do not suggest that after discovering contraband concealed under a suspect's clothing, officers are required to permit the suspect to remove the contraband. Such a result very well could undermine the police objectives of preserving the evidence and maintaining the safety of the officers at the scene. *See United States v. Thornton*, 325 F.3d 189, 192 (4th Cir. 2003) (observing that officer's safety "might well be endangered" and that evidence could be concealed or destroyed if officer cannot conduct search incident to arrest) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). As the Eighth Circuit has noted, "[s]ome physical contact is permissible, and indeed unavoidable, when police reach into a suspect's pants to remove drugs the suspect has chosen to hide there." *Williams*, 477 F.3d at 976.

Manifestly, in the present case, there were several alternatives available to the officers for removing the baggie from Edwards' penis, which neither would have compromised the officers' safety nor the safety of Edwards. These alternatives included untying the baggie, removing it by hand, tearing the baggie,[6] requesting that blunt scissors be brought to the scene

---

[6]Because Bailey could see from his vantage point that the sandwich baggie tied around Edwards' penis did not contain unpackaged amounts

to remove the baggie, or removing the baggie by other non-dangerous means in any private, well-lit area. Thus, we conclude that, in the absence of exigent circumstances, the right of the police to seize contraband from inside Edwards' underwear did not give the officers license to employ a method creating a significant and unnecessary risk of injury.

The government here expressly has disavowed reliance on any theory of exigent circumstances to support the removal of the contraband from Edwards' penis by use of a knife. Thus, the lack of any justification for using the knife in this manner defeats the government's argument that the search inside Edwards' underwear was reasonable, and requires that the evidence be excluded.

We further observe that application of the exclusionary rule is especially appropriate in this case. The "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2426 (2011). As the Supreme Court explained in *Herring v. United States*, 555 U.S. 135, 144 (2009), "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." The facts and circumstances before us demonstrate conduct plainly within the purposes of the exclusionary rule.

First, the circumstances under which Edwards was searched are likely to recur. Indeed, the evidence in this case showed that Baltimore City police officers conduct searches inside the underwear of about 50 percent of arrestees, in the same general manner as the strip search performed on Edwards.[7] Sec-

---

of suspected narcotics, but instead held many smaller blue ziplock baggies containing "a white rocklike substance," Bailey could have torn the sandwich baggie without compromising the evidence.

[7]Detective Bailey testified on cross-examination at the suppression hearing, in pertinent part, as follows:

ond, we cannot discount the real possibility that a suspect may suffer injuries when a knife is employed, even when it is used to remove contraband from the suspect's genitals in a well-lit and private setting.

Third, the interests of deterrence further are advanced by discouraging the routine use of dangerous procedures of this type when, as here, the officers were not operating under any exigency. And, a decision excluding the evidence in this case would not burden the police officers with responsibility for the judgment errors of others. *Cf. Davis*, 131 S. Ct. at 2428-29 (citing *United States v. Leon*, 468 U.S. 897, 922 (1984) (officers reasonably relied on a warrant later held to be invalid); *Arizona v. Evans*, 514 U.S. 1, 14 (1995) (officers reasonably relied on erroneous information concerning an arrest warrant)).

Based on the record before us, we decline to apply a "but-for" causation analysis to consider admissibility of the evidence on the separate ground that the constitutional violation was not the actual cause of the discovery of the evidence. *See Segura v. United States*, 468 U.S. 796, 815 (1984). The government did not make this argument either in the district court or before this Court. Thus, we will not consider the merits of that argument here. *See Jones v. Comm'r*, 642 F.3d 459, 466 (4th Cir. 2011) (citing *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993)) (issues raised for first time on appeal generally will not be considered); *see also United States v. Powell*, ___ F.3d ___, 2011 WL 5517347, at *3 n.4 (4th Cir. Nov. 14,

---

"Question: So is it customary for Baltimore City police officers to search the underwear area or the dip areas of people that are arrested?

Detective Bailey: I would say it's about 50 percent of the time, because nobody likes to do that search. . . . But if you have reason to believe that there might be something, then it's a good idea to check, because often they do hide things down there."

2011) ("By not presenting any of these arguments in its appellate brief" that were raised below in support of the lawfulness of an officer's search of a suspect, "the Government has abandoned them.").

We also observe that the government has failed to raise an "inevitable discovery" argument for our consideration in this case. It is the government's burden to prove inevitable discovery, *United States v. Allen*, 159 F.3d 832, 838 (4th Cir. 1998) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)), and, as the government conceded at oral argument in this case, the government did not advance an inevitable discovery argument either before the district court or on appeal. *See Jones*, 642 F.3d at 466; *Powell*, 2011 WL 5517347, at *3 n.4. Thus, we will not consider that issue here.

In view of these considerations, we hold that, under the *Bell* analysis, and in the absence of argument raised by the government supporting admission of the evidence on other grounds, the evidence unlawfully seized from Edwards' person is subject to exclusion. Accordingly, we conclude that the district court erred in denying Edwards' motion to suppress.

V.

For these reasons, we vacate the district court's judgment and remand the case for further proceedings.

*VACATED AND REMANDED*

DIAZ, Circuit Judge, dissenting:

Joseph Edwards was arrested pursuant to a valid warrant charging him with assault and handgun offenses, and searched incident to his arrest. The search did not result in public exposure of Edwards' genitals or bodily intrusion, was witnessed only by male officers, and occurred prior to placing Edwards in a police van for transport. The majority opinion disputes

none of these facts. Instead, it singles out as constitutionally unreasonable the use of a knife by an officer to remove a drug baggie strapped to Edwards' penis, and discovered in plain view during an otherwise lawful search. I respectfully dissent—not to endorse the carte blanche use of a knife to remove contraband from a defendant's person—but because, on this record, I do not believe that use of the knife alone rendered the search unreasonable.

As the majority correctly notes, "[t]he test of reasonableness [with respect to a search] . . . . requires a balancing of the need for the particular search against the invasion of personal rights that the search entails," *Bell v. Wolfish,* 441 U.S. 520, 559 (1979). In assessing this balance, courts are to consider (1) the place in which the search was conducted, (2) the scope of the particular intrusion, (3) the manner in which the search was conducted, and (4) the justification for initiating the search. *Id.* Applying *Bell* to the facts of this case, I would affirm the district court's denial of the motion to suppress.

The majority opinion focuses on the first three *Bell* factors, assuming, without deciding, that the officers were justified in searching Edwards. As to this latter issue, the search occurred incident to Edwards' arrest on a warrant stemming from an alleged domestic dispute earlier in the day. The alleged victim told police that Edwards pointed a firearm at her during the dispute, and the arrest warrant noted that Edwards was wanted on assault and handgun charges. Thus, as the district court concluded, officers searching Edwards had "reason to believe a weapon was involved, and there was a reason to want to make sure that there would be no safety issues before putting Mr. Edwards in the van." Further, the district court noted that Detective Bailey was aware of Edwards' prior drug record, thus suggesting that a more comprehensive search for contraband was in order. Based on the facts presented, I am satisfied that the officers were justified in initiating the search, and it seems that the majority agrees.

As to the first *Bell* factor—the location—the search regrettably was conducted on a public street and there is no gainsaying that it would have been better had the officers removed the defendant to the privacy of the nearby police van before peering into his waistband and partially exposing his pelvic area. The record, however, is silent as to whether others were present inside the van. But were the van occupied, conducting the search there may have exposed Edwards' genitals to the occupants, resulting in a greater invasion of privacy. Nevertheless, the search unquestionably occurred in public, which I concede cuts in favor of the majority's decision to reverse.

Turning to *Bell*'s consideration of the scope and manner of the search, I accept that the intrusion visited on Edwards meets the technical definition of a "strip search," as the majority holds. This was not a case, however, where the defendant was forced to remove all of his clothing in full view of the public. Moreover, it is undisputed that Edwards' pelvic area was exposed only to the male officers conducting the search. Thus, save for Detective Bailey's decision to use the knife to remove the drug baggie tied to Edwards' penis, it appears the majority would have little trouble affirming the district court's determination that the search was reasonable.

I respectfully disagree that the use of a knife was unnecessarily dangerous, and thus that the search was unreasonable. My distinguished colleagues accept that "[s]ome physical contact is permissible, and indeed unavoidable, when police reach into a suspect's pants to remove drugs the suspect has chosen to hide there," *United States v. Williams*, 477 F.3d 974, 976 (8th Cir. 2007), and I could not agree more.

Simply put, in assessing whether the police acted reasonably, we need not ignore Edwards' decision to store drugs in a rather unconventional location. Indeed, our cases recognize that context matters in assessing reasonableness under the Fourth Amendment, as we have upheld intrusive searches when justified by the circumstances. *See United States v. Dor-*

*louis*, 107 F.3d 248, 256 (4th Cir. 1997) (finding that officers did not conduct an "unconstitutional strip search" by placing the defendant in the jump seat of a police van and pulling down his trousers, where officers knew that a confidential informant had given the defendants $1,600 in marked money and the initial search did not disclose the money); *United States v. Daniels*, 323 F. App'x 201, 207 (4th Cir. 2009) (unpublished) (finding that officers acted reasonably in "pull-[ing] the waistband of defendant's sweatpants outward approximately three inches and look[ing] straight down into his underwear with a flashlight . . . without exposing [the defendant] to the public"); *see also Jenkins v. State*, 978 So. 2d 116, 126-27 (Fla. 2008) (upholding as reasonable a search incident to arrest where (1) the officers pulled the defendant's boxer shorts away from his body, but did not remove his clothes, (2) there was no evidence that defendant's genitals were exposed to the public, although the search took place at a gas station during business hours, and (3) in removing the drug baggie from the defendant's buttocks, the officers did not touch the defendant, but only the baggie); *State v. Smith*, 464 S.E.2d 45 (N.C. 1995) (upholding as reasonable the search of defendant's underwear and the removal of crack cocaine from underneath defendant's scrotum).

Peering inside Edwards' waistband, officers saw a baggie tied around his penis that contained smaller baggies that, in turn, contained "a white rocklike substance." At that point, the officers were entitled to seize the contraband discovered during a lawful search incident to arrest. *See Williams*, 477 F.3d at 976 ("While the potential for destruction of evidence is diminished when a suspect is in custody, it is not completely eliminated, and it was not unreasonable for the officers to assume the initiative by seizing the contraband . . . ."); *Jenkins*, 978 So. 2d at 128 (concluding that "the very limited intrusion into Jenkins' clothing was clearly outweighed by the need for law enforcement to retrieve the contraband before it could be discarded or destroyed").

That Edwards was handcuffed at the time does not negate the officers' legitimate need to seize plainly visible contraband, as other courts have correctly determined. For example, the defendant in *Jenkins* was unquestionably handcuffed at the time of the search, 978 So. 2d at 118, and the defendant in *Williams* was in custody, and thus presumably in handcuffs, at the time of the search, 477 F.3d at 975 (noting that officers "took Williams into custody, placed him in a squad car, and drove him several blocks to the police department's Fourth Precinct building" before conducting the search).

The majority does not challenge the officers' authority to seize visible contraband; rather, it faults the method used as unnecessarily dangerous. Based on the location of the contraband, however, there was simply no delicate way to seize it. As the government notes, the use of the knife "presumably permitted Detective Bailey to remove the contraband without actually touching the defendant's penis (which would have been a greater intrusion on the defendant's person) or uncuffing the defendant and allowing him to remove the baggie," which would have posed a security risk for the officers. Appellee's Br. 16 n.5.

The majority does not suggest that the officers should have allowed Edwards to remove the contraband himself. But while it posits certain alternatives for seizing it, I fail to see how the majority's suggestions are any more reasonable than the method chosen by the officers. The first three suggestions—untying, removing, or tearing the baggie—would require that officers physically touch Edwards' penis. In my view, however, a rule that directs officers to place their hands on a defendant's genitals as a first option for seizing contraband in a baggie that the defendant has chosen to strap to his penis seems no more attractive than the careful use of a knife. The majority next suggests that officers should have arranged for blunt scissors to be brought to the scene to remove the baggie. But this assumes that the knife actually used was not blunt, whereas the record offers no evidence as to its charac-

teristics. Finally, the majority's catch-all suggestion that officers should have used "other non-dangerous means in any private, well-lit area," Maj. Op. at 14, does not specify a method of removal, but instead relies on the location of the search—a *Bell* factor that the majority explicitly declines to adopt as a basis for its decision. Thus, while criticizing the officers' use of the knife as unreasonable, the majority has failed to articulate a method of removal that is any more reasonable. On that issue, the majority is in good company, for even Edwards' counsel conceded at oral argument that there was "no good option" for removal.

The majority notes that "in the absence of exigent circumstances, the right of the police to seize contraband from inside Edwards' underwear did not give the officers license to employ a method creating a significant and unnecessary risk of injury." Maj. Op. at 14. While this conclusion is unassailable, the record of the suppression hearing offers little information about the knife, the manner in which it was used to remove the contraband, or how long it took to accomplish the task.[1] The district court, moreover, made no mention of the knife in its ruling. This omission was not an oversight, but rather reflected the fact that the knife was not the focus of the parties' evidentiary presentations.[2]

---

[1]The majority appears particularly critical of the officers' decision not to use "the flashlight when Bailey removed the baggie containing the suspected drugs with his knife[,]" noting that the search took place at night in a dark area. Maj. Op. at 12. But that complaint overlooks the majority's earlier assertion, amply supported by the record, that a streetlight partially illuminated the area where the search was conducted. *Id.* at 5.

[2]The use of a knife to seize contraband was also of little constitutional moment in *Partlow v. State*, 24 A.3d 122 (Md. Ct. Spec. App. 2011). In finding that officers conducted a reasonable search incident to arrest where, after feeling an object during a pat-down, officers "pulled the underwear away from [defendant's] body and used a pocket knife to cut a small piece—'the size of a baseball maybe'—out of the underwear to retrieve the item," the court noted, but was not swayed by, the use of the knife. *Id.* at 126.

Based on this record, I fail to see how we can characterize the officers' actions as unreasonable. The majority disagrees, but in doing so it surmises that there were better options available to the officers. Outside of moving Edwards to the police van before conducting the search, however, I am at a loss to suggest one. In any event, even if we might in the comfort of chambers "imagine some alternative means by which the objectives of the police might have been accomplished," our retrospective ability to do so does not mean that the method chosen by the officers here was unreasonable. *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985).

In sum, I am unwilling to penalize the officers in this case for making the best of a difficult situation. Considering all of the circumstances, I would hold, as did the district court, that these officers acted reasonably in searching Edwards and removing the contraband found on his person.

A final point, albeit one not pressed by the government before the district court or on appeal: even if the majority is correct in its assessment that the method used to remove the contraband was constitutionally unreasonable, it is not clear that suppression is the proper remedy. As the Supreme Court has emphasized, "[s]uppression of evidence . . . has always been our last resort, not our first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). For that reason, "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is an 'issue separate from the question whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.' " *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)).

In declining to expand the exclusionary rule to knock-and-announce violations, *Hudson* cautioned that "[e]xclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence." 547 U.S. at 592. Moreover, because "but-for causality is . . . a necessary,

[but] not a sufficient, condition for suppression," the exclusionary rule should not be applied in cases where the evidence " 'has been come at . . . by means sufficiently distinguishable [from the illegality] to be purged of the primary taint.' " *Id.* (quoting *Wong Sun v. United States*, 371 U.S. 471, 487–488 (1963)). Such attenuation can occur when the evidence lacks a causal connection to the illegality or "when, even given a direct causal connection, the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Id.* at 593. The Court further noted that "[q]uite apart from the requirement of unattenuated causation," the exclusionary rule is only applied where its " 'deterrence benefits outweigh its substantial social costs.' " *Id.* at 594 (quoting *Penn. Bd. of Prob. and Parole v. Scott*, 524 U.S. 357, 363 (1998)).[3] Although the Court rejected suppression as a remedy for knock-and-announce violations, it noted the availability of a civil action under 42 U.S.C. § 1983. *Id.* at 597.

Post-*Hudson*, the Ninth Circuit in *United States v. Ankeny*, 502 F.3d 829 (9th Cir. 2007), declined to apply the exclusionary remedy where officers had a valid warrant to search a home, but conducted the entry and search in a violent and destructive manner. Specifically, officers used flash-bang devices that resulted in severe burns to the defendant and thousands of dollars in property damage. *Id.* at 833 & n.1. In moving for suppression of the evidence seized, the defendant argued that the force used by the police rendered the search unreasonable.

Noting that "[u]nnecessary destruction of property or use of

---

[3]The Court offered the following, not wholly dissimilar, example: "When, for example, a confessed suspect in the killing of a police officer, arrested (along with incriminating evidence) in a lawful warranted search, is subjected to physical abuse at the station house, would it seriously be suggested that the evidence must be excluded, since that is the only 'effective deterrent?' " *Hudson*, 547 U.S. at 596.

excessive force can render a search unreasonable," the Ninth Circuit chose not to decide this preliminary question. *Id.* at 836. Instead, it concluded that suppression was not the appropriate remedy because "[t]he alleged Fourth Amendment violation and the discovery of the evidence lack the causal nexus that is required to invoke the exclusionary rule." *Id.* at 837. In other words, because the police had a valid search warrant, "even without" the questionable methods the search would have been conducted and the evidence discovered. *Id.* at 838. Finally, the court noted that a § 1983 remedy remained available. *Id.* n.5.

Similarly, in *United States v. Watson*, 558 F.3d 702 (7th Cir. 2009), the Seventh Circuit found the exclusionary remedy inappropriate where the defendant alleged that officers used excessive force during a stop. After receiving information that a male in a maroon Dodge Intrepid was selling weapons, officers identified the car and "approached . . . with guns pointed at the occupants, whom they ordered to leave the car and walk backwards toward them." *Id.* at 703. The female driver consented to a search of the car, which uncovered weapons. The male defendant sought suppression, contending that even if police had authority to stop him, they had "no right to frighten him by pointing their guns at him." *Id.* at 704.

Citing *Hudson*, the court found "no causal connection" between the alleged violation and the search of the car. *Id.* Rather, "[h]ad [the police] said or done nothing to him, drawn and pointed no guns, but merely asked the driver for consent to search the car, the evidence would have been discovered." *Id.* Thus, even if police used excessive force, the remedy would be a suit under "42 U.S.C. § 1983 (or state law) rather than the exclusion from his criminal trial of evidence that had been seized in an otherwise lawful search." *Id.*

*Hudson*, *Ankeny*, and *Watson* cast doubt on whether exclusion is the appropriate remedy in this case, particularly if, as I understand it, the majority's reasoning turns on the means

employed to seize evidence discovered in plain view during an otherwise lawful search. As in *Ankeny* and *Watson*, had the officers not used what the majority perceives to be an unreasonable method to remove the drug baggie, they nevertheless would have discovered the contraband and (at some point) seized it in some other manner. Put simply, the plainly visible contraband was already discovered before the officers determined to use a knife to remove it. Thus, I question whether the record supports the causal connection that *Hudson* requires before resorting "to the massive remedy of suppressing evidence of guilt," 547 U.S. at 599.

Finally, I am skeptical about the deterrence value of the rule announced by the majority today, particularly given the lack of palatable options available to these officers on the bizarre facts presented. In advancing the propriety of the exclusionary rule, the majority notes that Detective Bailey testified that in nearly 50 percent of arrests, Baltimore City police officers conduct similar searches inside the defendants' underwear. Even if we are willing to credit that statistic, it seems to me that exclusion would be appropriate only if the majority concluded that the officers lacked suspicion to search inside Edwards' underwear or that the initial visual search was outside the bounds of the Fourth Amendment. That, however, would be a different opinion. What the majority does instead is single out the use of the knife to invalidate the search in toto. As to that narrow basis for the majority's holding, however, there is simply no evidence in the record, from Detective Bailey or otherwise, that officers routinely use a knife to remove contraband from a defendant's person. Further, the majority assumes that use of the knife posed a significant risk of injury. Again, however, this assumption is not supported by the record and was not the focus of the suppression hearing. Thus, given the majority's singular focus on the method of removal of plainly visible contraband, I question whether exclusion is warranted on these facts.

In any event, I need not resolve that issue because I am convinced that the officers acted reasonably. Accordingly, I dissent.