**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4020

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

LAMAR MEYERS,

Defendant – Appellant.

Appeal from the United States District Court for the District of South Carolina, at Charleston. Patrick Michael Duffy, Senior District Judge. (2:16-cr-00939-PMD-1)

Argued: December 13, 2018                                    Decided: January 23, 2019

Before GREGORY, Chief Judge, DUNCAN and DIAZ, Circuit Judges.

Affirmed by unpublished opinion. Judge Duncan wrote the opinion, in which Chief Judge Gregory and Judge Diaz concurred.

**ARGUED:** Cody James Groeber, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Charleston, South Carolina, for Appellant. Sean Kittrell, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, South Carolina, for Appellee. **ON BRIEF:** Beth Drake, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Defendant-Appellant Lamar Meyers claims that his Fourth Amendment rights were violated during a traffic stop and subsequent frisk and search. Under a conditional plea agreement, he challenges the district court's denial of his motion to suppress evidence obtained from that traffic stop that underlies his conviction under 18 U.S.C. § 922(g)(1). For the following reasons, we affirm.

## I.

## A.

On the night of April 18, 2016, police officer Christopher Wycoff observed Donald Moultrie driving a car without his tail lights on. Moultrie had been driving on a busy street in Charleston, South Carolina, with Defendant Meyers riding in the front passenger seat. After Wycoff signaled Moultrie to pull over, Moultrie turned into a gas station. Moultrie drove past several empty parking spaces before parking near the back of the lot by the station's dumpster. The parking spot was well-lit but was around twenty to thirty feet from the pumping stations and the convenience store entrance.

As Moultrie was parking, Wycoff observed him and Meyers moving around inside the car as though they were trying to conceal or reach for something. Once Wycoff approached the car, he turned on his body camera and captured most of the following encounter.

Wycoff introduced himself and told Moultrie that he had been driving with his lights off. He asked Moultrie for his vehicle registration, proof of insurance, and driver's

2

license. Moultrie handed Wycoff several papers, none of which were his license. Wycoff again asked for Moultrie's license, and Moultrie began looking for it. As Moultrie searched for his license, Meyers asked for permission to get out of the car. Wycoff told Meyers to "sit tight," because he wanted to keep both men in his line of sight and because the way the men were moving around made him nervous.

Wycoff asked if the men were on parole. Meyers acknowledged that he was on probation for a prior drug conviction. Wycoff asked several times whether they had any items in the car that they were not supposed to have. Moultrie answered no. Meyers said nothing. Suspecting that there were drugs or weapons in the car, Wycoff called for backup. While waiting for an officer to arrive, Wycoff continued questioning the men.

After Officer Beaver arrived as backup, Wycoff told Moultrie to get out of the car and patted him down. Wycoff again asked whether Moultrie had anything illegal in the car, and Moultrie stated that Meyers had a gun in his front pocket.

At that time, Officer Bradish arrived with a drug dog. Wycoff told Bradish that Meyers had a gun, returned to the car, and told Meyers to put his hands on his head and get out of the car. Once Meyers did so, Beaver and Bradish patted him down and lifted up his shirt while Wycoff asked Meyers if he had any weapons. Meyers said he did not. Wycoff handcuffed Meyers and took over the frisk. After feeling what he thought were drugs in Meyer's pocket, Wycoff reached in and found a folded bill with a powdery substance inside it which was later identified as fentanyl.

Wycoff asked Beaver to check for a gun in the car. After Beaver failed to find one, Wycoff began frisking Meyers again. He felt what he believed to be a gun in

3

between Meyer's legs and said, "It's in his pants." Meyers offered to retrieve the gun himself. Wycoff refused and positioned Meyers to face him. This also faced Meyers towards the walkway between the pumping stations and attached convenience store. All three officers stood between Meyers and the convenience store.

Wycoff put on a latex glove and unbuttoned Meyers's pants. Meyers was wearing gym shorts under the pants, and underwear under the shorts. Wycoff reached inside the shorts with his gloved hand. At that point Meyers said, "It's in the drawers." Wycoff confirmed this with Meyers and pulled Meyers's underwear out and partially down for several seconds, exposing Meyers's genitals to Wycoff's body camera. Wycoff pulled the underwear back up, put a glove on his other hand, and reached back into the underwear, retrieving a gun.

## B.

Before the district court, Meyers filed a motion to suppress evidence from the stop, raising several arguments about the legality of seizing a car passenger and the reasonableness of the strip search. The district court denied the motion. Meyers entered a conditional guilty plea, preserving his right to appeal. This appeal followed.

## II.

We analyze the legal conclusions underpinning a district court's denial of a motion to suppress evidence de novo and the factual findings for clear error. *United States v. Blake*, 571 F.3d 331, 338 (4th Cir. 2009). We view the evidence in the light most

4

favorable to the prevailing party, here the United States. *See United States v. Elie*, 111 F.3d 1135, 1140 (4th Cir. 1997).

## III.

On appeal, Meyers contends that the stop, frisk, and search in this case violated his Fourth Amendment rights against unlawful search and seizure. *See* U.S. Const. amend. IV. Specifically, Meyers argues that: 1) the police officer who conducted the traffic stop unlawfully detained him when the officer ordered him to "sit tight" after Meyers asked to exit the car; 2) the frisk of Meyers was actually a search for which there was no probable cause, and in any case was unreasonably intrusive; and 3) the subsequent strip search of Meyers was not reasonable. We address each argument in turn.

## A.

First, Meyers contends that Wycoff violated his Fourth Amendment rights by refusing to let him exit the car during the traffic stop and leave the scene. This is foreclosed by the Supreme Court's holding in *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

In *Johnson*, the Court held that the temporary seizure of a passenger during a traffic stop is presumptively reasonable for the duration of the stop. *Id.* A traffic stop "communicates to a reasonable passenger that he or she is not free to terminate the encounter with the police and move about at will." *Id.* In that case, the Court found that "[n]othing occurred . . . prior to the frisk, [to indicate that] the traffic stop had ended or

that [the defendant] was otherwise free 'to depart without police permission.'" *Id.* at 333–34 (quoting *Brendlin v. California*, 551 U.S. 249, 257 (2007)). Accordingly, the officer "was not constitutionally required to give [the defendant] an opportunity to depart the scene without first ensuring that . . . she was not permitting a dangerous person to get behind her" and was permitted to pat the defendant down for her own safety. *Id.* at 334.

Meyers argues that police officers must have a particularized suspicion that a passenger may be dangerous or engaged in criminal activity to detain him or her in traffic stops. This is flatly wrong. The *Johnson* Court made clear that "[t]he police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity" in order to effectuate a lawful investigatory stop. *Id.* at 327. Rather, a lawful investigatory stop may be effectuated "whenever it is lawful for police to detain an automobile *and its occupants* pending inquiry into a vehicular violation." *Id.* (emphasis added). Meyers, as an occupant of a vehicle detained during a lawful investigatory stop, was therefore lawfully detained for the duration of the stop and was not entitled to leave at will, and Wycoff was "not constitutionally required" to give Meyers "an opportunity to depart the scene" before taking necessary precautions to protect officer safety. *Id.* at 334. The suggestion by Meyers's counsel at oral argument that Meyers's request to leave the scene distinguishes this case from *Johnson* ignores the plain language of the Court's holding.

Meyers's argument also ignores the security rationales underlying that holding. The Supreme Court has long recognized that "traffic stops are 'especially fraught with danger to police officers.'" *Id.* at 330 (quoting *Michigan v. Long*, 463 U.S. 1032, 1047

6

(1983)). Therefore, the Court has reasoned that "[f]or the duration of a traffic stop . . . a police officer effectively seizes everyone in the vehicle, the driver and *all passengers*." *Id.* at 327 (emphasis added) (citation and internal quotation marks omitted). If Meyers had been allowed to leave, he would have been free to move about and to pose the very threat that troubled the Court. The seizure of Meyers was therefore permissible.

## B.

Next, Meyers argues that Wycoff's interaction with Meyers outside the car was a search, not a frisk, and that Wycoff lacked probable cause to conduct a search. He also argues that regardless of whether the interaction was a frisk or a search, it was unreasonable because it was unnecessarily intrusive. We conclude, however, that the pat downs of Meyers were supported by reasonable suspicion and were not unreasonably intrusive.

Officers conducting traffic stops may frisk passengers "upon reasonable suspicion that they may be armed and dangerous." *Id.* at 332 (citation omitted). Frisks involve "a protective pat down for weapons" where an officer reasonably believes that the person may be armed and dangerous, although anything that "exceeds the bounds" of such a pat-down requires probable cause. *United States v. Hernandez-Mendez*, 626 F.3d 203, 211 (4th Cir. 2010). Here, the district court properly determined that Wycoff had reasonable suspicion to frisk Meyers. This reasonable suspicion arose from Moultrie's statement that Meyers was armed and Meyers's movements in the car as Moultrie was parking, which suggested that Meyers was trying to obtain or conceal something.

7

On appeal, Meyers appears to challenge the district court's factual findings by arguing that the court's determination that the interaction was a frisk, or a simple protective pat-down, rather than a more intrusive search is clearly erroneous. He grounds his challenge on several bases. First, Meyers argues that Wycoff's description of the interaction at the suppression hearing as a "probable cause search" shows that it was a search and not a frisk. J.A. 88. But Meyers provides no legal support for the contention that an officer's characterization of an interaction alone is a basis on which we can determine that a district court clearly erred.

Next, Meyers argues that Wycoff searched him when Wycoff emptied Meyers's pocket because he felt what he thought were drugs. Pursuant to a frisk, an officer may seize objects whose character as contraband is "immediately apparent" without thereby converting the frisk into a search. *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Here, we need not decide whether it was "immediately apparent" to Wycoff from the frisk that the folded-up dollar bill was contraband because Wycoff continued to frisk Meyers after seizing the dollar bill. That frisk, pursuant to which Wycoff located the gun, continued to be supported by reasonable suspicion. Therefore, for purposes of his suppression motion, Meyers has failed to rebut its reasonableness.[1]

---

[1] Meyers also argues that there were multiple frisks. It is unclear whether this characterization is based on the fact that multiple officers were involved in the frisk, or whether it is because the frisk lasted for a certain period of time--apparently, according to Meyers's Opening Brief, approximately two minutes. In any event, the legally dispositive inquiry is not the length or quantity of the frisks but whether the manner in which they were conducted was impermissibly intrusive, as discussed *infra*.

8

Finally, Meyers argues that the frisk was unreasonable because it was more intrusive than necessary, citing *Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."). Meyers would have us conclude that upon first patting him down and failing to find a weapon, the officers should have stopped frisking him altogether. This ignores the fact that prior to frisking him at all, the officers had reason to believe him to be armed. Based on Moultrie's face-to-face tip that Meyers had a gun in his front pocket, it was reasonable for the officers to continue frisking Meyers when they failed to find the gun in his front pocket. This is true regardless of whether the frisk continued slightly longer than Meyers believes was necessary, because Wycoff had not yet been able to "verify or dispel" his reasonable suspicion. *Royer*, 460 U.S. at 500. We therefore conclude that Meyers's second argument also fails.

## C.

Meyers's final argument is that the strip search following Wycoff's frisk was unreasonable. We agree with Meyers's characterization that following Moultrie's statement that he had a gun and Wycoff's identification of a hard object in Meyers's pants, he was subjected to a strip search. *See United States v. Edwards*, 666 F.3d 877, 882 (4th Cir. 2011) (noting that a search that "resulted in the pulling outward of the suspect's underwear, and the exposure of the suspect's pelvic area" constitutes a strip search). Under *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), we assess the reasonableness

9

of a strip search under the Fourth Amendment by considering 1) the searching official's justification for conducting it, 2) the place in which the search was conducted, 3) the scope of the particular intrusion, and 4) the manner in which the search was conducted. *Id.* We address each of these factors in turn.

We begin by considering the justification for the search at issue. It was conducted to locate the gun that Moultrie identified and that Wycoff believed he felt while patting Meyers down. Locating the gun provided a compelling safety justification for conducting the search immediately. *See West v. Murphy*, 771 F.3d 209, 215 (4th Cir. 2015) (recognizing an important "security justification" for strip searches for weapons). Indeed, Meyers concedes that a strip search was justified "once Wycoff felt the butt of the gun and Mr. Meyers admitted there was a gun in his underwear." Appellant's Br. at 17. This strong government interest provides the justification for establishing prong one.

As to prong two, the location of the search weighs in Meyers's favor. Indeed, "whether a strip search was conducted in private is especially relevant" in determining whether it was reasonable. *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001) (quoting *Polk v. Montgomery County*, 782 F.2d 1196, 1201–02 (4th Cir. 1986)). Privacy considerations entail assessment of "whether a sexually invasive search could have been viewed by others, and whether it was in fact viewed by others." *Edwards*, 666 F.3d at 883. That this search was conducted in a gas station parking lot weighs against the reasonableness of the search. These concerns are mitigated, however, by the fact that officers placed themselves between Meyers and other individuals in the parking lot. Additionally, the fact that these individuals were twenty to thirty feet away from the

10

location of the search, limiting the risk that Meyers's exposure was readily apparent to others, also helps to alleviate his concerns.

Balancing the antecedent concerns, the reasonable scope and manner of the intrusion establish the reasonableness of the search at issue. The scope of the search was confined to the area where the officers had reason to believe the contraband was located.[2] The officers did not expose Meyers's groin until Meyers told them that the weapon was in his drawers, and when they began the search the officers looked only for the weapon.

Last, the search was not conducted "in a manner that poses an unnecessary risk of harm to the person being searched." *Edwards*, 666 F.3d at 885. As the district court noted, Wycoff proceeded carefully and gently, wearing gloves and engaging in "no physical contact beyond the 'unavoidable' amount *Edwards* allows." *United States v. Meyers*, No. 2:16-cr-939-PMD, 2017 WL 3310971 at *8 (D.S.C. Aug. 3, 2017). Meyers argues that the search was conducted in an inappropriate manner because Wycoff pulled Meyers's pants down, and because the search would have better protected his privacy if the officers had turned him to face away from the gas station patrons. Although these

---

[2] Appellee argues that assessing the scope of the intrusion with reference to the location of the contraband an official was searching for collapses the "scope" prong of the inquiry into the "justification" prong. This objection is formalistic--the prongs of analysis operate under a broad rubric of reasonableness, so an assessment of how intrusive it was for an officer to search a defendant in a particular place must be done with reference to why an officer was searching that place, *see Amaechi*, 237 F.3d at 361–62. For instance, if the officers had demanded that Meyers remove his shirt and shoes after determining that he had a gun in his pants, the scope of their search may have given rise to reasonableness concerns even though such a search would have been less intrusive than the search conducted here. Conversely, although the search of Meyers's groin was intrusive, its scope was reasonably focused on the area where Wycoff believed he had felt a gun.

11

concerns pertain more to the location of the search than to the manner in which it was conducted, within the rubric of our broader reasonableness assessment they do not change the analysis. The reasonableness of a search does not turn on whether officers took every possible means to minimize its intrusiveness; under the exigent circumstances of this case, the officers did take reasonable efforts to do so, and that suffices to establish the reasonableness of the search. The district court therefore correctly denied Meyers's motion to suppress evidence derived from that search.

## IV.

Accordingly, because the traffic stop, frisk, and search did not violate Meyers's Fourth Amendment rights, the district court's decision is

*AFFIRMED.*